**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 26 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GARY BRISTOL,

      Plaintiff-Appellee,

v.

THE BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF CLEAR CREEK and
DON KRUEGER, in his official
capacity as the Sheriff of the County
of Clear Creek,

      Defendants-Appellants,

_____

COUNTY SHERIFFS OF
COLORADO, INC.,

      Amicus Curiae.

No. 00-1053

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 98-Z-1743)**

---

Robert M. Liechty, Denver, Colorado, for Defendants-Appellants.

Evan S. Lipstein of Law Offices of Evan S. Lipstein, Lakewood, Colorado, (John
W. Berry, Denver, Colorado, with him on the brief), for Plaintiff-Appellee.

Josh A. Marks and Andrew D. Ringel, Hall & Evans, L.L.C., Denver, Colorado,
filed a brief on behalf of the Amicus Curiae.

Before **EBEL** and **LUCERO**, Circuit Judges, and **VRATIL**, District Judge.[*]

**EBEL**, Circuit Judge.

This appeal involves several issues arising under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 - 12213. Specifically, we hold, first, that in a case tried to a jury, the court decides whether the plaintiff has identified "impairments" and "major life activities" recognized under the ADA, but that the jury decides whether the plaintiff has demonstrated by a preponderance of the evidence whether the identified impairment "substantially limits" one or more of the identified major life activities such that the plaintiff should be considered "disabled" for purposes of the ADA. Second, we hold that a position is "vacant," for purposes of considering whether an employer has a duty to transfer a disabled employee to that position, see Smith v. Midland Brake, Inc., 180 F.3d 1154, 1175 (10th Cir. 1999) (en banc) (hereinafter, "Midland Brake"), only if the employer knows, at the time the employee asks for a reasonable accommodation, that the job opening exists or will exist in the fairly immediate future. A position is not vacant if, as here, the employer did not know at the time the employee asks for a reasonable accommodation that the position would become vacant in the fairly

_____

[*]Honorable Kathryn H. Vratil, District Court Judge, District of Kansas, sitting by designation.

- 2 -

immediate future, even if it did in fact open up a reasonable time after the employee's request had been made. Third, we hold that the trial court was correct in ruling that Bristol could establish discrimination by showing that the County failed reasonably to accommodate him by reassigning him to a vacant position. Bristol is not required to establish separate proof of discriminatory intent. Fourth, we hold that the district court erred by not allowing the jury to decide whether both the County and the Sheriff are properly treated as Bristol's employers for purposes of this lawsuit.

## BACKGROUND

A. Gary Bristol

Gary Bristol worked as a jailer for the Sheriff of Clear Creek County, Don Krueger, from February 1990 to March 1996. On March 23, 1996, Bristol suffered chest pain after he and other officers had to restrain forcibly a combative prisoner. Bristol was taken by ambulance from Georgetown, Colorado – where he was working – to St. Anthony's Hospital in Denver. Hospital employees treated and tested Bristol's heart condition[1] for two to three hours, but he was not hospitalized.

---

[1] Bristol began having heart troubles in 1991. After a mild heart attack, he had bypass surgery to clear one artery of obstruction. As a result of this initial heart problem and surgery, Bristol did not go to work for four to five months.

- 3 -

Bristol's doctors decided to treat his worsened coronary condition with medicine, rather than surgery. Dr. Jerry Sam Miklin, Bristol's cardiologist, wrote to the Sheriff's Office stating that Bristol's weakened heart required him to receive light-duty assignments. The Sheriff complied by assigning Bristol to work first in the evidence vault for a week, and then on light-duty in the jail, doing paperwork, monitoring cameras, and opening cell doors. After Bristol took a stress-test in early April 1996, Dr. Miklin again wrote the Sheriff's office, explaining that Bristol's heart condition was "indefinite" and that he should not have contact with inmates or any other job that might lead to severe or strenuous activity. By "indefinite," Dr. Miklin meant "permanent, cardiac-related problems." Specifically, Dr. Miklin prohibited Bristol from lifting more than fifty pounds on a continuous basis, being exposed to cold weather (except infrequently), and being in situations that would cause emotional or physical stress.

Bristol continued doing light-duty work in the jail from mid-April 1996 to May 20, 1996. On May 20, 1996, however, Bristol was discharged. The termination notice stated: "Upon review of your doctor's orders it is apparent that you can no longer perform the essential functions of a Confinement Officer. . . . I can not accommodate this restriction on an indefinite schedule. . . . You have the

right to appeal this decision as outlined in the Clear Creek County Personnel Policy Manual adopted on April 5, 1994."

Bristol appealed his termination to the County Personnel Review Board ("PRB"). The hearing took place on July 11, 1996, and the PRB upheld Bristol's dismissal. The PRB encouraged Bristol to apply for available County positions and stated that he might be given a hiring preference if he was qualified for a job opening.

There were at least two job openings within the County at the time of the PRB hearing in mid-July 1996: equipment operator in the road and bridge department, and appraiser-trainee. Bristol interviewed for both jobs. Shortly thereafter, however, Dr. Miklin told Bristol that he could not work as an equipment operator because that job could involve shoveling, lifting heavy objects, or clearing obstructions off the blades of the equipment.

The County Assessor, Diane Settle, was responsible for hiring the appraiser-trainee. The appraiser-trainee was one of five positions in the Assessor's office. The job description for appraiser-trainee states that the person holding that position is responsible for: (i) assessing the value of County property by physically inspecting it and by reviewing market data on similar properties; (ii) researching and keeping current the Assessor's computer data-base; and (iii) responding to questions and complaints in person, by phone, and through

correspondence. The job description also lists "Required Experience," which is described as: "[A] level of knowledge and ability to handle all routine tasks with considerable assistance in the full range of job duties. Such a level is generally acquired through up to two (2) years experience in a related field." The required education is described as a high school diploma or equivalent, and the required skills are described as (i) proficient in communications and in public relations and (ii) moderate skill in typing, the use of PCs, ten-key calculators, and copiers.

Following standard procedure within the County, Buckley reviewed Bristol's resume and forwarded it and the other applications to Settle. She interviewed nine applicants for the job, including Bristol. Her interview with Bristol lasted ten to fifteen minutes, about as long as every other interview. Settle believed Bristol was not interested in the job because his wife had scheduled the interview and because he gave "short, minimal" answers to her interview questions. He seemed like he was just "going through the motions." Settle testified that she hired a man with three years of experience in an assessor's office. According to Buckley, Bristol was not given "preference" when he applied for this job.

After he interviewed for the position of appraiser-trainee, the County did not inform Bristol of any other job openings from 1996 to 1998 – until he filed this lawsuit in 1998, at which time the County told him about a bookkeeping

position, but before he could respond that job was filled. Gail Buckley was not instructed to keep Bristol advised about other job openings.

In October or November of 1996, the job of dispatcher II came open in the Sheriff's Office. The Sheriff's Office had three types of dispatchers: dispatcher I (starting dispatcher with no experience); dispatcher II (experienced dispatcher); and dispatcher III (supervisor). The dispatcher II job required two years previous experience as a dispatcher and skills to use a dispatcher's equipment, including specialized software, and to prioritize incoming calls by importance. Bristol had received some training as a dispatcher when he was jailer at the Sheriff's Office, when he had relieved other dispatchers for short periods of time. Nevertheless, the Sheriff did not contact Bristol when the dispatcher II job came open because, as he testified, "it had been so long since we'd heard from him that I had forgotten about Mr. Bristol."

After being fired by the County, Bristol worked nights for about a year at a part-time computer job he found through a temporary agency. He also worked for two months transporting prisoners within Colorado for a private company, but quit that job because he was dissatisfied with how the company sought to ensure the safety of its workers. At the time of trial, Bristol was working part-time for a rental car company driving rental cars to their outlets. He applied, but was not

hired, for positions with the Cities of Lakewood and Aurora and the Colorado State Patrol, among others. He also received disability benefits from the County.

B. <u>The Relationship between the Sheriff's Office and the County</u>

In Colorado, counties and the offices of county commissioner and county sheriff are created under separate sections of the Colorado Constitution. <u>See</u> Colo. Const. art. XIV, § 1 (county), § 6 (county commissioner), and § 8 (county sheriff). Colorado statutes define the powers and duties of counties, county commissioners, and county sheriffs. <u>See generally</u> Colo. Rev. Stat. tit. 30. Sheriffs have the power to appoint undersheriffs and deputies, as well as fix their salaries, subject to the approval of the board of county commissioners. <u>See</u> Colo. Rev. Stat. § 30-2-106(1).

Clear Creek County is governed by a Board made up of three county commissioners. The Board establishes the budget for the Sheriff's Office. Employees who work in the Sheriff's Office are paid out of this budget. The Sheriff's Office uses County services for administration, including employee benefits, accounting, bookkeeping, and personnel. The Sheriff chose to adopt a County compensation plan. The Sheriff also consults with the County Director on Human Resources and the County Attorney on personnel issues.

The County's Personnel Review Board reviews policies, procedures, and personnel issues. It creates and approves job descriptions, including those for the Sheriff's Office. The provisions of the County personnel policy manual govern the Sheriff's employees. The Sheriff's Office has its own policy and procedural manuals for its employees that supplement the County's general manual.

Bristol's paychecks were signed by a County commissioner. Bristol took his personnel questions, e.g., questions about his employee benefits, to the County human resource director.

C. Procedural History

Bristol filed suit in August 1998. A jury trial was held November 16 to 18, 1999. During the trial, the court ruled, over Appellants' objections, (1) that the question of what constituted the "fairly immediate future" for purposes of determining whether a position was "vacant" under Midland Brake, 180 F.3d at 1175, was to be determined by the jury, and (2) that Bristol's witness, Dr. Joanne Bourn, would be allowed to testify as an expert.

At the close of evidence, both parties moved for judgment as a matter of law under Federal Rule of Civil Procedure 50. Appellants sought judgment as a matter of law under Rule 50 for the following issues: (i) only the Sheriff's Office, not the County, qualified as Bristol's employer; (ii) the dispatcher II position was

not "vacant" because it did not become open in the "fairly immediate future"; (iii) Bristol was not qualified for the appraiser-trainee position; and (iv) Bristol had failed to prove that Appellants had intended to discriminate when they failed to reassign him. Bristol moved for judgment as a matter of law on the following: (i) determining "disability" under the ADA is a question of law for the court and not a question of fact for the jury; (ii) Bristol was "disabled" for purposes of the ADA; and (iii) public relations skills were a marginal part of the appraiser-trainee position. In addition, the parties and the court agreed that the court would determine whether the County qualified as Bristol's employer.

Pursuant to Rule 50, the court decided: (1) the Sheriff and the County (not just the Sheriff) were Bristol's employers; (2) whether Bristol was "disabled" for purposes of the ADA was for the court (not the jury) to decide; (3) Bristol was "disabled" under the ADA; and (4) Bristol did not need to prove with direct evidence that Appellants acted with a discriminatory motive so long as there was proof of failing to make a reasonable accommodation.

The court then submitted the case to the jury. Jury Instruction #18 directed the jury to determine if Appellants had proven by a preponderance of the evidence that Bristol had failed to mitigate his damages by not taking reasonable steps to find employment after he was fired. The parties and the court believed at that

time that back-pay was an issue for the jury, so included a special verdict question to that effect.

The jury returned a special verdict, (i) finding Bristol had proven that Appellants had discriminated against him by failing to reasonably accommodate his disability, (ii) awarding back-pay in the amount of $72,544, and (iii) awarding compensatory damages[2] of $140,000.

The court held a post-trial hearing regarding damages on December 22, 1999, at which time Appellants called three witnesses. One of those witnesses was Sarah Nowotny, a vocational rehabilitation consultant, who testified regarding how long it would take Bristol to find another job in the relevant labor market. In addition, the parties stipulated to additional medical restrictions placed on Bristol by Dr. Miklin. The stipulated restrictions prohibited Bristol from (1) repetitive lifting of more than twenty pounds, (2) exposure to cold weather less than forty degrees for more than ten minutes at a time, (3) activity requiring Bristol to lift more than ten pounds with his upper body, and (4) shoveling. Appellants filed a motion for a new trial on the ground that Dr. Miklin's additional restrictions on Bristol constituted a material misrepresentation

---

[2]Under the ADA, back-pay and front-pay are not "compensatory damages." See McCue v. Kansas, 165 F.3d 784, 791-92 (10th Cir. 1999).

of evidence at trial, and they renewed their motion for judgment as a matter of law.

The court continued the post-trial hearing on January 18, 2000. By that time, the parties and the court correctly recognized that, pursuant to 42 U.S.C. § 2000e-5(g)(1), the court rather than the jury should award back-pay. See McCue v. Kansas, 165 F.3d 784, 791-92 (10th Cir. 1999). The court adopted the back-pay award given by the jury. It declined Appellants' suggestion to make additional findings on mitigation, letting the jury's decision in that regard stand unchanged.

The court awarded front-pay of $26,174. It arrived at that figure by calculating two years of salary as an appraiser-trainee ($65,998) and subtracting Bristol's probable earnings from other employment ($11,024) and anticipated disability benefits ($28,800) over those two years. It reasoned, "I think Mr. Bristol is going to need a little extra help in finding that job, and it may indeed take him two years and some retraining to find a job close to what he was earning as a jailer." The court also granted Appellants' motion for remittitur, lowering the jury's award for compensation to the statutory maximum of $100,000, and Bristol's motion for attorney fees of $41,609.

This appeal followed.

**DISCUSSION**

To establish a prima facie case under the ADA, a plaintiff must prove: (1) he is a disabled person as defined by the ADA; (2) he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) the employer discriminated against him because of his disability. See Doyal v. Okla. Heart, Inc., 213 F.3d 492, 495 (10th Cir. 2000).

A. "Disability"

The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). At issue in this case is § 12102(2)(A). Three elements must be established for a plaintiff to be considered "disabled" under this subsection of the ADA: first, plaintiff must have a recognized "impairment"; second, plaintiff must identify one or more appropriate "major life activities"; and third, plaintiff must show that the impairment "substantially limits" one or more of the major life activities. See Bragdon v. Abbott, 524 U.S. 624, 631 (1998). The question presented in this case is who decides, the court or the jury, each of these three steps.

- 13 -

Whether the court or the jury decides an issue is a matter of law reviewed de novo.  See McCue, 165 F.3d at 787.  Supreme Court and Tenth Circuit precedent provide a clear answer to this question: steps one ("impairment") and two ("major life activity") are questions of law for a court to decide, while step three ("substantially limits") is a question of fact for a jury.

The determination of whether a plaintiff has a "physical or mental impairment" for purposes of the ADA involves evaluating whether the plaintiff's alleged impairment "satisfies the statutory and regulatory definition" of an ADA impairment.  See Bragdon, 524 U.S. at 637.  The Equal Employment Opportunity Commission (EEOC) further defines "impairment" for purposes of the ADA in 29 C.F.R. § 1630.2(h).  It is well established that the list of recognized impairments found at § 1630.2(h) is "not meant as a comprehensive enumeration" of impairments, see Poindexter v. Atchison, Topeka & Santa Fe Ry. Co., 168 F.3d 1228, 1231 (10th Cir. 1999), but rather is a "representative list of disorders and conditions" which aid in determining whether plaintiff's alleged impairment qualifies under the ADA.  See Bragdon, 524 U.S. at 633; see also 45 C.F.R. pt. 84, App. A, at 345 (2000) ("The definition does not set forth a list of specific diseases and conditions that constitute physical or mental impairments because of

the difficulty of ensuring the comprehensiveness of any such list.").[3]  The

exercise of ascertaining whether a plaintiff's alleged impairment satisfies the

statutory and regulatory definitions under the ADA is decidedly a legal one, and

we have treated it as such in the past.  See Poindexter, 168 F.3d at 1230

("[W]hether a claimed affliction constitutes an impairment under the ADA . . . [is

a] determination[] of law for the court to decide.").

Similarly, "whether the identified endeavor constitutes a major life activity

[is a] determination[] of law for the court to decide."  Id.  As we have stated:

> The ADA and Rehabilitation Act regulations also assist courts in
> determining whether a particular endeavor may properly be
> considered a major life activity. "Rather than enunciating a general
> principle for determining what is and is not a major life activity,
> [these] regulations instead provide a representative list, defining
> [the] term to include 'functions such as caring for one's self,
> performing manual tasks, walking, seeing, hearing, speaking,
> breathing, learning, and working.'" Bragdon, 524 U.S. at [638], 118
> S.Ct. at 2205 (quoting 45 C.F.R. § 84.3(j)(2)(ii) (1997); 28 C.F.R.
> § 41.31(b)(2) (1997)); see also 29 C.F.R. § 1630.2(i) (1998).

Id. at 1231 (alterations in original).  Thus, it is not surprising that we concluded

in Poindexter that "the district court erred in submitting the legal issues of

impairment and major life activity to the jury."  Id. at 1232.

---

[3]Strictly speaking, 45 C.F.R. pt. 84, App. A applies only to the
Rehabilitation Act, but courts have applied statements from this appendix to cases
involving the ADA.  See Bragdon, 524 U.S. at 633; Poindexter, 168 F.3d at 1231.

Before we address the question of who decides the third ("substantially limits") step of ADA disability analysis, we pause to reiterate three other points about steps one and two. First,

> in order to state a claim under the ADA, a plaintiff must articulate with precision the impairment alleged and the major life activity affected by that impairment.
> . . . A plaintiff has the option of clarifying his or her position at the pleading stage or waiting until trial to prove with particularity the impairment and major life activity he or she asserts are at issue.

Id. Second, the court must affirmatively identify those impairments and major life activities upon which plaintiff relies and determine whether they qualify as such under the ADA. See Doyal, 213 F.3d at 495. Third, a court need consider only the alleged impairments and major life activities proposed by the plaintiff. See Poindexter, 168 F.3d at 1231.

In contrast to steps one and two, step three – "tying the two statutory phrases together [by] ask[ing] whether the impairment substantially limited the [identified] major life activity," Bragdon, 524 U.S. as 631 (emphasis added) – is a factual question for the jury. "The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis." Albertson's, Inc v. Kirkingburg, 527 U.S. 555, 566 (1999) (quoting 29 C.F.R. pt. 1630, App., § 1630.2(j) (1998)); see also Sutton v. United Air Lines, Inc. 527 U.S. 471, 483 (1999); Aldrich v. Boeing Co., 146 F.3d 1265, 1270 (10th Cir. 1998) ("Whether an impairment 'substantially limits' a major life activity

depends on the individual and the impairment. Such determinations are not susceptible to per se rules; they must be made on a case-by-case basis.").

The ADA's regulations expounding upon the term "substantially limits" make clear why this step is factual in nature.

> (1) The term <u>substantially limits</u> means:
>     (i) Unable to perform a major life activity that the average person in the general population can perform; or
>     (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
> (2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:
>     (i) The nature and severity of the impairment;
>     (ii) The duration or expected duration of the impairment; and
>     (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j). Determining both how well "the average person in the general population" performs any given major life activity and whether the plaintiff has proven he is "unable to perform" or is "significantly restricted" in performing a major life activity involves weighing evidence and assessing credibility of witnesses, tasks historically given to the jury in our judicial system. <u>See</u> <u>Edmonson v. Leesville Concrete Co., Inc.</u>, 500 U.S. 614, 625 (1991) (stating that when the jury is the "principal factfinder, [it is] charged with weighing the evidence, judging the credibility of witnesses, and reaching a verdict");

- 17 -

<u>Baltimore & Carolina Line, Inc. v. Redman</u>, 295 U.S. 654, 657 (1935) (noting the common-law distinction in which the jury finds facts and the court resolves legal issues). Likewise, evaluating evidence regarding the three factors of § 1630.2(j)(2) and applying those determinations to answer the ultimate question of whether a plaintiff has carried his burden of demonstrating that his asserted impairment substantially limits one or more of his asserted major life activities lie within the traditional province of the jury.

In <u>Davoll v. Webb</u>, 194 F.3d 1116, 1135 (10th Cir. 1999), where this question was not squarely presented, we assumed this conclusion:

> In determining whether the ADA plaintiff is substantially limited in a major life activity, the <u>jury</u> should consider [three factors]. <u>MacDonald v. Delta Air Lines, Inc.</u>, 94 F.3d 1437, 1444 (10th Cir. 1996) (quoting 29 C.F.R. § 1630.2(j)(2)). In determining whether such a plaintiff is substantially limited with respect to working, the <u>jury</u> should also consider [three additional factors]. <u>Bolton v. Scrivner, Inc.</u>, 36 F.3d 939, 943 (10th Cir. 1994) (quoting 29 C.F.R. § 1630.2(j)(3)(ii)).

<u>Id.</u> at 1135 n.12 (emphasis added). Sister circuits also assume that this decision is for the jury. <u>See</u> <u>Lebron-Torres v. Whitehall Labs.</u>, 251 F.3d 236, 241 (1st Cir. 2001) (discussing that without certain evidence "a jury would not be able to perform the careful analysis that is necessary to determine that [the plaintiff] was substantially limited in her ability to work"); <u>Weber v. Strippit, Inc.</u>, 186 F.3d 907, 913 (8th Cir. 1999) (entertaining the claim that "a reasonable jury could have found that he was substantially limited in one or more major life activities").

- 18 -

Most circuit courts agree with our conclusion that this question is factual. See Kiphart v. Saturn Corp., 251 F.3d 573, 582 (6th Cir. 2001) ("[D]etermining whether an impairment substantially limits a person in a major life activity ultimately requires an individualized, fact-specific inquiry into the effect of an impairment on a plaintiff's life."); Maziarka v. Mills Fleet Farm, Inc., 245 F.3d 675, 679 (8th Cir. 2001) (calling the determination of whether an impairment "substantially limits" a major life activity "highly fact-intensive"); Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25, 32 (1st Cir. 2000) (relating that the determination of whether a plaintiff's impairment substantially limits a major life activity is a "fact-specific analysis"); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643 (2d Cir. 1998) (stating that the "substantial limitation" inquiry is "individualized and fact-specific"); Leisen v. City of Shelbyville, 153 F.3d 805, 808 (7th Cir. 1998) ("[T]his record contains no evidence from which a reasonable factfinder could conclude that she was substantially limited in the life activity of working."). Cf. Wilcott v. Matlack, Inc., 64 F.3d 1458, 1460-61 (10th Cir. 1995) (stating that the question of whether an ERISA participant was totally and permanently disabled from any kind of work for purposes of long- and short-term disability benefits was factual and thus reviewed for clear error). But see Bartlett v. N. Y. State Bd. of Law Exam'rs, 226 F.3d 69, 80 (2d Cir. 1998) ("Whether an individual is substantially limited with respect to a major life

activity is a mixed question of law and fact. We therefore review this aspect of the district court's judgment de novo.") (citation omitted).

The trial judge in this case erroneously concluded that all three steps of the disability analysis should be decided by the court, based on misreadings of Bragdon and Poindexter. In Bragdon, the Supreme Court wrote that to determine whether Respondent was "disabled" under subsection (A) of § 12102(2),

> Our consideration . . . proceeds in three steps. First, we consider whether respondent's HIV infection was a physical impairment. Second, we identify the life activity upon which respondent relies (reproduction and child bearing) and determine whether it constitutes a major life activity under the ADA. Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity.

See 524 U.S. at 631. The trial court below interpreted this passage to mean that the court should decide all three steps in all cases. Bragdon's language is explained, however, by the fact that the Court was reviewing cross-motions for summary judgment. See id. at 629. Given that posture, it is unremarkable that the Court indicated that "we," meaning the court, should undertake every step. Indeed, it is apparent that the Supreme Court in Bragdon assumed the "substantially limits" step was factual when it wrote, "We agree with the District Court and the Court of Appeals that no triable issue of fact impedes a ruling on the question of . . . [whether] Respondent's HIV infection is a physical

- 20 -

impairment which substantially limits a major life activity, as the ADA defines it." 524 U.S. at 641.

Poindexter further confused the trial court because there, in the context of reviewing a case that had been submitted to a jury, we paraphrased Bragdon, writing,

> First, the court must determine whether the plaintiff has an impairment. Second, the court must identify the life activity upon which the plaintiff relies and determine whether it constitutes a major life activity under the ADA. Third, 'tying the two statutory phrases together, [the court] ask[s] whether the impairment substantially limited the major life activity.'

Poindexter, 168 F.3d at 1230 (alterations in original) (citations to Bragdon omitted). The Poindexter court continued, "Thus, the Court in Bragdon makes clear that whether a claimed affliction constitutes an impairment under the ADA and whether the identified endeavor constitutes a major life activity are determinations of law for the court to decide." Id. It is notable that in Poindexter we did not include the third step in our conclusion that the first and second steps are determinations of law for the court to decide. The trial court in this case, however, incorrectly extrapolated from the foregoing that the court was also to resolve whether an impairment "substantially limits" one or more major life activities. Given the somewhat misleading language from Bragdon and Poindexter, it is not surprising that the district court reached its conclusion, and so today we seek to clarify the issue and hold that when determining whether a

plaintiff is "disabled" for purposes of the ADA, the third ("substantially limits") step is for the jury to decide, while the first ("impairment") and second ("life activity") steps are for the court to decide.

Applying this discussion to the facts of this case, we first find that Bristol articulated with appropriate precision, and the district court correctly identified, that Bristol's alleged impairment was a heart condition.  Second, we find that Bristol asserted, and the district court identified, working as the major life activity on which he predicated his claim of "disability."  After reviewing the record, however, we believe Bristol did not articulate with precision that he was relying on "lifting" as a second major life activity; he did not mention lifting in his complaint or his Final Pretrial Order.  Indeed, all of Bristol's evidence at trial regarding his "substantial limitation" was directed at his ability to work.  And even in his final argument to the district court, Bristol never clearly indicated that he was relying on lifting as a second major life activity.  His counsel stated:

> [T]he impairment is that he has a weakened heart that according to Dr. Miklin is operating at something like 50 percent of normal efficiency. . . . [T]hat results in limiting certainly the major life activity of working.  But an additional major life activity that is mentioned by the court in Dovall, at least, is lifting.  And you heard Dr. Miklin talk about how Mr. Bristol could not lift anything more than 50 pounds on a regular basis.  But certainly in terms of working, his lifting impacts working.  His inability to be out in the cold impacts work, and his inability to engage in strenuous activities limits working.

While in this passage counsel mentions lifting as a major life activity, it is not sufficiently clear whether he intends it to be distinct or supportive of working.

Likewise, the district court couched Bristol's inability to lift as a causal factor in why he was limited in his ability to work and not as a discrete major life activity:

> The activities that are impaired or limited are his ability to have any stressful or strenuous activity or lift heavy objects on the job. . . . It limits one or more of his major life activities, to wit: working, . . . more specifically, strenuous or stressful activity or lifting heavy objects on the job.

Appellants' counsel most clearly stated the issue when, in the midst of all this argument, he asked, "Are we talking about working being the major life activity that the impairment affects, or are we talking about lifting?" Neither Bristol nor the court followed up on this question and clarified that lifting was also to be considered a major life activity. Thus, while we find the issue close, we believe Bristol articulated <u>with precision</u> and pled <u>with particularity</u> that he was predicating his claim of disability only on the major life activity of working.[4]

---

[4]Even if Bristol had articulated lifting as a major life activity, it likely would not avail him for two reasons. First, he produced evidence that his heart condition prevented him from lifting more than fifty pounds on a continuous basis. "A number of courts have held that lifting restrictions similar to [Bristol's] are not substantially limiting. . . ." <u>Thompson v. Holy Family Hosp.</u>, 121 F.3d 537, 539-40 (9th Cir. 1997) (finding that a 25 pound lifting restriction for continuous lifting and a 50 pound restriction no more than twice a day did not "substantially limit" plaintiff's ability to lift and citing supporting cases from the

(continued...)

As to the third ("substantially limits") step of the ADA's disability analysis, we find that the district court erred when it concluded that that step was a question of law for the court to decide. It is a factual question for the jury. Therefore, we grant Appellants' request and remand this case to the district court for a new trial.

In so doing, we decline Bristol's suggestion to affirm the district court's decision on the alternative ground that the court properly decided, as a matter of law under Rule 50, that Bristol's heart condition "substantially limited" his ability to work.[5] We review de novo a district court's grant of a motion for judgment as a matter of law, applying the same standard as the district court. See Knowlton v. Teletrust Phones, Inc., 189 F.3d 1177, 1186 (10th Cir. 1999). Judgment as a matter of law is appropriate only "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a

---

[4](...continued)
Fourth, Fifth, and Eighth Circuits). Second, Bristol pointed to no evidence of how much the average person can lift. Without this evidence, a factfinder cannot make the comparison between Bristol and the "average person" as ADA regulations require. See Doyal, 213 F.3d at 497 ("Because [plaintiff] introduced no evidence suggesting she experienced greater difficulty than anybody else learning the new computer system or any other new material, she has failed to demonstrate that she was significantly restricted in learning.").

[5]Of course, our clarification today that this third step is factual and reserved for the jury does not preclude a court from deciding it in the appropriate circumstance, e.g., upon a motion for summary judgment (Rule 56) or judgment as a matter of law (Rule 50).

reasonable jury to find for that party." Fed. R. Civ. P. 50(a)(1). "[A] court may grant the motion only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." Davis v. United States Postal Service, 142 F.3d 1334, 1339 (10th Cir. 1998) (alteration in original) (quotation marks omitted). We construe the evidence and inferences therefrom in the light most favorable to Appellants, the non-moving parties. See Knowlton, 189 F.3d at 1186.

In this case, Bristol would have met his burden if he had demonstrated sufficiently that his heart condition substantially limited his ability to work:

> With respect to the major life activity of working –
> (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i); see also Sutton v. United Airlines, Inc., 527 U.S. 471, 491 (1999) ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs.").

Bristol failed to carry this burden. He did not produce evidence of the job market for "the average person having comparable training, skills and abilities," as we have held the regulations require. See Bolton v. Scrivner, Inc., 36 F.3d

939, 944 (10th Cir. 1994) (affirming summary judgment dismissing an ADA claim because "[t]he evidence does not address Bolton's vocational training, the geographical area to which he has access, or the number and type of jobs demanding similar training from which Bolton would also be disqualified"). Neither did he show that his heart condition prevented him from working in a broad class of jobs.

Bristol put on one expert, Dr. Joanne Bourn, to establish that his heart condition substantially limited his ability to work. The closest she came to testifying directly to this issue came in the following exchange on direct examination:

> Q: [D]o you have an opinion whether [Bristol is] restricted from a substantial number of jobs that are available in the Denver metropolitan area?
>
> A: There will be many jobs that he would be capable of assuming the responsibility, yes.
>
> Q: And how about jobs that he could not do for someone with a high school – high school diploma and the experience he has?
>
> A: There would be many limitations with that also, yes.

We make two observations regarding Dr. Bourn's first response. First, it is in the affirmative. She responds that there are many jobs Bristol <u>could</u> (not "could not") do. In context, though, it seems she (or the court reporter) omitted a negative. Second, even if such an omission occurred, she states merely that Bristol would

not be capable of performing "many jobs." In her second response, she says he would have "many limitations." We find that this testimony does not rise to the level of proving that Bristol was substantially limited in his ability to work, especially when we view the evidence in the light most favorable to Appellants, as we must in addressing this particular argument by Bristol. The Supreme Court has made clear that for an impairment to substantially limit the ability to work it must prevent the plaintiff from working in a substantial class of jobs or a broad range of jobs in various classes. See Sutton, 527 U.S. at 492-493 (stating that, even assuming plaintiffs could not work as global airline pilots, they had not produced evidence that they could not work as regional pilots or pilot instructors, among other positions).

Bristol attempts to buttress Dr. Bourn's testimony by noting that Bristol had only a high school education and worked for the majority of his life in blue-collar jobs. He also recites the specific restrictions Dr. Miklin placed upon him, i.e., that he could not lift fifty pounds on a continuous basis, be exposed to cold weather (except infrequently), be placed in high-stress situations, or undertake physically strenuous activities. However, this is insufficient to establish that he was substantially limited in his ability to work. Therefore, we conclude that Bristol was not "disabled" as a matter of law.

We also decline to consider Appellants' suggestion that we enter judgment as a matter of law for them on this issue. Appellants candidly admit that they did not move for judgment as a matter of law on the issue, but they urge us to extend to them the rule for entering summary judgment against a non-moving party, citing Armijo v. Atchison, Topeka & Santa Fe Railway Co., 27 F.3d 481, 482-83 (10th Cir. 1994) and Dickeson v. Quarberg, 844 F.2d 1435, 1444 n.8 (10th Cir. 1988).

Initially, we note that it is rare for an appellate court to enter summary judgment in favor of the non-moving party. See Armijo, 27 F.3d at 483 (citing E.C. Ernst, Inc. v. Gen. Motors Corp., 537 F.2d 105, 109 (5th Cir. 1976) ("Although it is occasionally proper for an appellate court to enter summary judgment for the non-moving party, this occurs only in the rare case in which it is very clear that all material facts are before the reviewing court.")). More important, however, the different procedural postures of summary judgment and judgment as a matter of law make it inappropriate to construe opposing the latter as equivalent to opposing the former.

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56, Advisory Committee Notes, 1963 Amendment, Subdivision (e). Prior to trial, granting summary judgment in favor of the non-

moving party may well "secure the just, speedy and inexpensive determination of every action" by disposing of an issue or the case before the parties and the court has invested the resources necessary to carry off a trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

In contrast, judgment as a matter of law is used during or after a trial. See Fed. R. Civ. P. 50. By that time, the parties and the court have expended a terrific amount of resources to produce the evidence upon which the verdict will rest. Accordingly, Rule 50(a)(2) requires that "a motion for judgment be made prior to the close of trial, subject to renewal after a jury verdict has been rendered. The purpose of this requirement is to assure the responding party an opportunity to cure any deficiency in that party's proof that may have been overlooked until called to the party's attention by a late motion for judgment." Fed. R. Civ. P. 50, Advisory Committee Notes, 1991 Amendment, Subdivision (a). By the time a trial has been mounted, the judicial system has an interest in curing defects of proof, to the extent that is reasonably possible. Thus, by failing below to move for judgment as a matter of law, Appellants failed to afford Bristol the opportunity Rule 50 gives him to reasonably supplement the evidence to support his claim that his heart condition substantially limited his ability to work. Consequently, we decline to convert Appellants' opposition to Bristol's Rule 50

- 29 -

motion into opposing summary judgment and, thus, do not consider whether we should direct a verdict for them on this issue.

In conclusion, we reverse the disposition of the trial court and remand for a new trial consistent with this opinion.

B. "Discrimination"

Bristol alleged that Appellants discriminated against him in violation of the ADA when they did not reassign him to either the position of appraiser-trainee in the County Assessor's Office or the position of dispatcher II in the Sheriff's Office. Appellants countered by arguing: (1) Bristol failed to prove that they possessed discriminatory intent, (2) Bristol was not qualified for either position, (3) the County was under no duty to transfer Bristol to the position of appraiser-trainee because the Sheriff, not the County, was Bristol's employer, and (4) the dispatcher II job was not "vacant" as a matter of law. We address each issue in turn.

1. Intent to Discriminate

Appellants argue that the trial court erred by not requiring Bristol to prove that the County "was motivated by discriminatory intent." They assert that this error caused the court to improperly deny (1) their motion for judgment as a matter of law under Rule 50 and (2) two proposed jury instructions requiring

Bristol to prove discriminatory intent. This argument has no merit. In Midland Brake, 180 F.3d at 1167, this court held that "the failure reasonably to accommodate (including reassignment) [is] a prohibited act of discrimination." Thus, assuming Bristol established the other elements of his claim, when the County failed to reassign him to a vacant position it discriminated against him. Therefore, we affirm the district court's denial of Appellants' Rule 50 motion and jury instructions regarding the alleged need for separate proof of discriminatory intent.

2. Appraiser-Trainee Position

Appellants argue that they were under no duty to transfer Bristol to the job of appraiser-trainee because the County was not Bristol's employer. In addition, they argue that the trial court erred by denying their Rule 50 motion that Bristol was not qualified for this position as a matter of law. For the reasons stated below, we affirm the district court's ruling on the qualification issue, but reverse and remand for a jury determination as to whether the County is properly considered to be Bristol's employer.

a. The County as Bristol's employer

Under the ADA, the definition of employer is substantially similar to that under Title VII, and this court has applied reasoning from Title VII cases to determine whether an entity is a plaintiff's employer in the context of the ADA.

See Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999).

"Acknowledging [that a court] must consider many factors and an employee can have more than one employer for Title VII purposes, the main focus of the court's inquiry is the employer's right to control the means and manner of the worker's performance." Atchley v. Nordam Group, Inc., 180 F.3d 1143, 1153 (10th Cir. 1999) (quotation marks omitted) (emphasis in original). The other factors used to determine whether an entity is a plaintiff's "employer" include:

> (1) the kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the employer; (9) whether the worker accumulates retirement benefits; (10) whether the employer pays social security taxes; and (11) the intention of the parties. No single factor is conclusive. Rather, the courts are to look at the totality of circumstances surrounding the working relationship between the parties.

Lambertsen v. Utah Dep't of Corr., 79 F.3d 1024, 1028 (10th Cir. 1996) (footnote omitted).[6]

---

[6]This court, like others, has lifted the Lambertsen factors from the context of distinguishing between employees and independent contractors and applied them to ADA and Title VII cases. As such, they serve as rough-and-ready reminders in what is simply a totality-of-the-circumstances test.

The district court granted Bristol's Rule 50 motion, ruling that the County was Bristol's employer. The district court appears to have approached the issue as a matter of law, and did not set forth any application of the <u>Lambertsen</u> factors. Rather, after hearing argument from counsel, the court simply stated that "the Court will rule as a matter of law and grant plaintiff's motion that both the sheriff and the board of county commissioners are the employers." (Tr. 278.)

To the extent that the district court analyzed the question of the County's status as an employer as a legal issue, it misconstrued the nature of the inquiry. In this circuit, determining whether an entity qualifies as an employer is a fact issue for the jury. See <u>Zinn v. McKune</u>, 143 F.3d 1353, 1357 (10th Cir. 1998) (finding evidence insufficient for <u>Lambertsen</u> analysis to reach jury in Title VII case); <u>id.</u> at 1362 (Briscoe, J., concurring) (noting that "whether [defendant] was [plaintiff's] employer is a question of fact"). <u>Cf.</u> <u>Marvel v. United States</u>, 719 F.2d 1507, 1515 (10th Cir. 1983) (recognizing that "the determination of whether an individual is an employee is a question of fact"). <u>But cf.</u> <u>Waxman v. Luna</u>, 881 F.2d 237, 240 (6th Cir. 1989) (analyzing whether person is employee under ERISA as question of law); <u>Penn v. Howe-Baker Engineers, Inc.</u>, 898 F.2d 1096, 1101 n.5 (5th Cir. 1990) (same); <u>Holt v. Winpisinger</u>, 811 F.2d 1532, 1536 (D.C. Cir. 1987) (same).

To the extent that the district court couched its ruling "as a matter of law" based on an implicit conclusion that no reasonable jury could deny the County's employer status, see Holter v. Moore and Co., 702 F.2d 854, 855 (10th Cir. 1983) (recognizing that, although employment relationship is question of fact, "the sufficiency of the evidence to create an issue of fact for the jury is solely a question of law"); see also Glynn v. Roy Al Boat Mgmt. Corp., 57 F.3d 1495, 1498 (9th Cir. 1995) ("We have long held that whether an employer/employee relationship exists is usually a question of fact for the jury, so long as there is an evidentiary basis for its consideration."), that conclusion was erroneous.

From Lambertsen's list, factors 3 and 5 through 11 appear to be relevant to whether the County was Bristol's employer. However, we must begin with the "main focus" of the inquiry: Did the County control the means and manner by which Bristol did his work as jailer? The answer is clearly in the negative; the Sheriff controlled how Bristol did his job day-to-day, while the County had no role in those decisions. And even though the Clear Creek County Sheriff's Department may have voluntarily chosen to have the County Personnel Review Board review all terminations of the Sheriff's employees, under Colorado law the Sheriff could not have limited his own discretion to hire or fire Bristol. See Seeley v. Board of County Comm'rs, 791 P.2d 696, 700 (Colo. 1990) (en banc) (holding that county sheriffs alone have the power to hire and fire their

employees, and that a sheriff does not even "possess the statutory authority to limit his power to discharge [an employee] at his pleasure"). This would suggest that factor six – the manner in which the employment relationship is terminated – also weighs against viewing the County as Bristol's employer.

However, a reasonable jury could conclude that most of the remaining factors weigh in favor of a finding that the County was Bristol's employer. The County provided the jail and the equipment used in the jail (factor 3). The County Commissioner signed Bristol's checks (factor 5). Bristol received leave on the same basis as other County employees, and it was administered by the County human resource director (factor 7). The County paid for all benefits received by employees of the Sheriff's office. Typically, this includes paying retirement benefits and social security taxes (factors 9 & 10). Further, the County paid Bristol's disability benefits.

It is less clear what the County's and Bristol's intentions were regarding their employment relationship (factor 8), and the jury would be within reason to accept or reject the notion that Bristol's work was "integral to the business" of the County (factor 11). On one hand, the jury could conclude that, insofar as Bristol was a part of County law enforcement by virtue of working in the Sheriff's Office as a jailer, he did work integral to the County's business of enforcing the law and keeping good order. On the other hand, the jury could

focus on the distinct identities of the Sheriff and the County Board, and conclude that the Sheriff's duties are no more integral to the business of the Board than the duties of the executive are integral to the business of the legislature.

The employment relationship of Bristol and the County is a close question, well within the jury's province.[7] While the County did not oversee Bristol's work day-to-day, it did have substantial control over many of the other aspects of the terms and conditions of his employment as jailer. It was error for the district court to preclude the jury from determining whether the County can properly be considered Bristol's employer. We therefore vacate and remand the district court's grant of Bristol's Rule 50 motion on this issue.

---

[7] We recognize that, in Owens v. Rush, 636 F.2d 283 (10th Cir. 1980), this court held that, for purposes of determining the scope of Title VII's coverage, "the Sheriff should be considered an agent of the County." Id. at 287. Even though Title VII excluded employers with fewer than fifteen employees, the court reasoned that the Sheriff (with fewer than fifteen employees) was not excluded because the County had more than fifteen employees. The court's agency finding was based on the fact that the Sheriff "is elected by the body politic and acts on its behalf in enforcing the state's laws." Id. at 286.

We find that Owens has little relevance to this case, as the essential question here is whether the County should have independent liability to Bristol as a co-employer, whereas in Owens the issue was only whether the Sheriff fell within the statutory definition of an employer under 42 U.S.C. § 2000e(b) by virtue of being an "agent" of the County. The determination of whether two entities can be considered a "single employer" to meet the fifteen-employee requirement is not coextensive with the determination of whether a valid claim may be stated against both entities. See 1 Lex K. Larson, Employment Discrimination § 5.03[1], at 5-24 (2d ed. release 58, June 2001).

## b. Bristol's qualifications for the appraiser-trainee position

Appellants assert that the district court erred in denying their motion under Rule 50 that Bristol was not qualified for the position of appraiser-trainee as a matter of law. We note, however, that the County reviewed Bristol's resume and decided to interview him. This indicates that the County believed that he was qualified enough to merit an interview. In addition, Dr. Bourn testified at length as to why Bristol was qualified for the position of appraiser-trainee.[8] Bristol himself also testified as to why he believed he was qualified for the position. The jury heard testimony about the job description, which was entered as plaintiff's

_____

[8] Appellants argue that the trial court erred in permitting Dr. Bourn to testify as an expert witness for Bristol. "[T]he district court has broad discretion in determining whether or not to admit expert testimony, and we review a decision to admit or deny such testimony only for abuse of discretion." Orth v. Emerson Elec. Co., White-Rodgers Div., 980 F.2d 632, 637 (10th Cir. 1992). "It is within the trial court's broad discretion to decide whether or not an expert's testimony will 'assist the trier of fact to understand the evidence or determine a fact in issue.'" Id. (quoting Rule 702). Appellants present no evidence that the trial court abused its discretion in concluding that Dr. Bourn would assist the factfinder to understand the evidence about whether Bristol was qualified for the positions he sought and about whether his heart condition substantially limited his ability to work. Thus, we affirm the trial court's decision to admit her as an expert witness.

Appellants further object that the district court erred in permitting Dr. Bourn to testify that Bristol could be trained for the appraiser-trainee position. Since Appellants did not object to Dr. Bourn's testimony regarding training when she was giving it, we review this objection for plain error. See Pandit v. Am. Honda Motor Co., Inc., 82 F.3d 376, 379 (10th Cir. 1996); Fed.R.Evid. 103(d). We decline to exercise our discretion to address this alleged error because it clearly does not seriously affect the fairness, integrity, or public reputation of these judicial proceedings. See Jones v. United States, 527 U.S. 373, 389 (1999).

exhibit #9, and why Bristol would or would not fit that description.  On appeal,
we review the district court's denial of a Rule 50 motion by examining the
evidence in the light most favorable to the non-moving party, in this case Bristol.
In that light, there was clearly enough evidence to support the court's denial of
Appellants' motion and to send the issue to the jury.  We thus affirm the district
court's decision.

     3. <u>Dispatcher II Position</u>

Appellants appeal the trial court's denial of their Rule 50 motion that the
dispatcher II position was not "vacant" as a matter of law.  We have held that a
reasonable accommodation may include reassignment to a vacant position if the
employee is qualified for the job and it does not impose an undue burden on the
employer.  <u>See</u> <u>Midland Brake</u>, 180 F.3d at 1169.  Thus, an employer is under a
duty to reassign an employee only if the employer has "vacant" positions.  <u>See</u> <u>id.</u>
at 1175.  "'[A] vacant position' includes not only positions that are at the moment
vacant, but also includes positions that the employer reasonably anticipates will
become vacant in the fairly immediate future." <u>Id.</u>

The parties produced the following evidence: Bristol suffered his minor
heart attack in March 1996.  At that time, he requested a light-duty assignment,
which the Sheriff provided.  One month after Bristol took his stress test and Dr.
Miklin determined that Bristol should continue on light-duty indefinitely, the

- 38 -

Sheriff decided to fire him. Bristol appealed to the Personnel Review Board on July 11, and it informed him that his termination was upheld July 16. The dispatcher II position came open in October or November 1996. At the time the Sheriff fired Bristol, the Sheriff did not know that the position would become available in October or November. This final fact is dispositive, causing us to reverse the trial court's ruling and enter judgment on this issue for Appellants. As a matter of law, the dispatcher II position was not "vacant" at the relevant time because it was not within the contemplation of the Sheriff when he denied Bristol's request for a reasonable accommodation and terminated his employment.[9]

Apparently, the district court focused exclusively on Midland Brake's use of the term "fairly immediate future," whereas the language of the opinion makes clear that another aspect of whether a position is vacant involves the employer's subjective knowledge of the upcoming opening:

> "[A] vacant position" includes not only positions that are at the moment vacant, but also includes positions that the employer reasonably anticipates will become vacant in the fairly immediate future. See Monette [v. Elec. Data Sys. Corp.], 90 F.3d [1173,] 1187 [(6th Cir. 1996)] ("If, perhaps, an employer knows that a position for which the disabled applicant is qualified will become vacant in a short period of time, the employer may be required to offer the

_____

[9]Since we find as a matter of law that the dispatcher II position was not "vacant," we need not consider Appellants' further arguments that Bristol was not qualified for it or that he did not participate in the interactive process.

- 39 -

position to the employee."); see also EEOC Guidance, at 39 ("'Vacant' means that the position is available when the employee asks for reasonable accommodation, or that the employer knows that it will become available within a reasonable amount of time.").

Midland Brake, 180 F.3d at 1175 (emphasis added); see also 29 C.F.R. pt. 1630, App., § 1630.2(o) (stating as an example that if "[t]he employer . . . knows that an equivalent position for which the individual is qualified[] will become vacant next week," then that position should be considered "vacant" and the employer may have a duty to reassign the employee to that position when it becomes available (emphasis added)).[10]

**CONCLUSION**

We REVERSE and REMAND for jury determinations the district court's rulings on whether Bristol is substantially limited in the major life activity of

---

[10]Appellants further complain that the trial court erred in denying their jury instructions that related to (1) how Bristol's impairment "substantially limited" his ability to work, (2) whether the County was Bristol's employer, and (3) whether Bristol needed to prove affirmatively that Appellants intended to discriminate against him. As Appellants acknowledge, this complaint is derivative of our consideration on the merits of each of the above issues. Thus, given our dispositions above, we hold that the trial court (1-2) erred in not giving jury instructions on "substantially limited" and on whether the County was Bristol's employer, and (3) did not err in refusing to give an instruction regarding whether Bristol proved that Appellants intentionally discriminated against him. In addition, given our rulings, Appellants' argument for a new trial is moot.

Finally, Appellants appeal several rulings pertaining to remedies. Because those asserted errors do not appear likely to recur in the event of a retrial, we decline to consider them given our reversal and remand on the issue of liability.

working, and as to whether the County is properly considered to be Bristol's employer. Further, we REVERSE the district court's denial of Appellants' Rule 50 motion that the dispatcher II position was not "vacant" as a matter of law, and enter judgment on this issue for Appellants. We REMAND for a new trial consistent with this opinion.

No. 00-1053, <u>Bristol v. Board of County Commissioners of the County of Clear Creek</u>

**LUCERO**, Circuit Judge, dissenting.


While I agree with most of the majority opinion and find it well-reasoned, I write separately because I respectfully disagree with the majority's analysis of whether the County was an employer of Bristol. Short of upsetting Colorado's system of local government, we could not uphold a jury finding of fact that plaintiff is an employee of the County. I therefore ultimately conclude that as a matter of law the plaintiff cannot be an employee of the County. We should respect the constitutional scheme that the State of Colorado has created to govern its various counties, and we should not empower a jury to force one state constitutional officer to be responsible for the actions of another.

## I

I agree with the majority that the multi-factor test we developed in <u>Lambertsen v. Utah Department of Corrections</u>, 79 F.3d 1024, 1028 (10th Cir. 1996), is the correct starting point for our analysis. I also agree that, as a general rule, "determining whether an entity qualifies as an employer is a fact issue for the jury." (Majority Op. at 33.) However, in this particular context the combination of the <u>Lambertsen</u> test with Colorado constitutional and statutory law

regarding local government requires a finding that, as a matter of law, the County could not have been plaintiff's employer.

As the majority correctly points out, the "main focus of the court's inquiry is the employer's right to control the manner of the worker's performance." Atchley v. Nordam Group, Inc., 180 F.3d 1143, 1153 (10th Cir. 1999) (quotation omitted). The majority and I agree that the County clearly did not have control over the manner of Bristol's performance in this case, and the majority acknowledges that the Sheriff had complete control over Bristol's job performance. But a close examination of Colorado law makes clear just how complete and exclusive the Sheriff's control over his employees is.

The county sheriff is a constitutional office in Colorado, a position that is separate and distinct from the board of county commissioners. See Colo. Const. art. XIV, § 6 (election of county commissioners), § 8 (election of sheriffs and other county officers). Colorado state law explicitly provides that sheriffs have the power to hire and fire employees at will. Colo. Rev. Stat. § 30-10-506. The Colorado Supreme Court has not only held that county sheriffs alone have the power to hire and fire their employees, but also that a sheriff does "not possess the statutory authority to limit his power to discharge [an employee] at his pleasure." Seeley v. Bd. of County Comm'rs, 791 P.2d 696, 700 (Colo. 1990) (en banc) (quotation omitted) (holding that a county sheriff had the power to hire and

fire employees at will, despite adoption of a personnel manual that purported to limit that power). Thus, even though the Clear Creek County Sheriff's Department may have voluntarily chosen to have the County Personnel Review Board review all terminations of the Sheriff's employees, under Colorado law the Sheriff could not have restrained his discretion to hire or fire Bristol in this manner. At any time he could have disregarded the Personnel Review Board's recommendations.

Other Colorado state court cases emphasize the lack of control that a county's board of county commissioners has over a sheriff's employees and over the employees of other county officials whose independence is protected under Colorado law and the Colorado Constitution. See, e.g., Schroeder v. Bd. of County Comm'rs, 381 P.2d 820, 822–23 (Colo. 1963) (holding that once a board of county commissioners has approved the salary for an employee, it could not have used its budgetary power over the county superintendent of schools to force him to fire that employee, where the superintendent's power to hire and fire was established by state law); Tunget v. Bd. of County Comm'rs, 992 P.2d 650, 652 (Colo. Ct. App. 1999) (holding that the sheriff, not the county or board of commissioners, was liable for injuries resulting from the sheriff's employees'

negligence because "[t]he sheriff, not the county or the Board, has the right of control with respect to the [sheriff's] deputies").[1]

Federal district courts have also considered control by a county over a sheriff's employees to be a factor in the context of suits under Title VII of the Civil Rights Act and 42 U.S.C. § 1983. A number of courts have stated that the sheriff can terminate his employees at will, regardless of the existence of a county personnel manual or other actions by a board of county commissioners. See Goodwin v. Debekker, 716 F. Supp. 1363, 1365 (D. Colo. 1989) (holding that a sheriff had not limited his discretion to fire an employee through adoption of the county's personnel policy manual); Jackson v. Johns, 714 F. Supp. 1126, 1130 (D. Colo. 1989) (same); see also Harrison v. Bd. of County Comm'rs, 775 F. Supp. 365, 369 (D. Colo. 1991) ("Colorado law is clear that a sheriff may revoke the appointment of a deputy sheriff at his or her pleasure."); Coover v. Summit County, No. 86-F-12, 1986 WL 28915, at *2 (D. Colo. Mar. 21, 1986) (holding that a sheriff's employee does not have a property interest in his job because he

---

[1] While a board of county commissioners may have to approve the overall budget of a sheriff's department and the salaries of the sheriff's employees, the Colorado Supreme Court has indicated that the sheriff is free to adjust the number or salary of his employees as long as he stays within the overall budget provided by the board. See Tihonovich v. Williams, 582 P.2d 1051, 1055–56 (Colo. 1978) (en banc).

-4-

can be terminated at will by the sheriff, and "[t]his mandate could not be abrogated or restricted at the county level").[2]

Of the other eleven Lambertsen factors, the majority concludes that eight might be pertinent. (Majority Op. at 34.) Even though Lambertsen does not prescribe a quantitative analysis, for the purposes of this discussion I do not dispute the majority's determination that factors five (method of payment), seven (annual leave), nine (accumulation of retirement benefits), and ten (payment of social security taxes) might weigh in favor of finding that the County was the employer of plaintiff. I concur with the majority's conclusion that it is unclear in

---

[2] Two federal district courts have held that sheriff's department employees are employees of the county. See Robertson v. Bd. of County Comm'rs, 985 F. Supp. 980, 985 (D. Colo. 1997) (holding that sheriff's department employees are employees of the county for purposes of a Fair Labor Standards Act suit because of the board's approval of salaries and budget); Johnson v. Bd. of County Comm'rs, 859 F. Supp. 438, 442 (D. Colo. 1994) (holding that a board is the plaintiff's employer for purposes of Title VII). Both of these cases relied to a great extent on our decision in Owens v. Rush, 636 F.2d 283 (10th Cir. 1980). See Robertson, 985 F. Supp. at 985; Johnson, 859 F. Supp. at 441. I agree with the discussion in the majority opinion that while Owens does control the fifteen-worker jurisdictional issue, it is not controlling on the issue of who has responsibility to provide accommodation to a worker. (Majority Op. at 36 n.7.) Moreover, both of these cases relied on the ability of a board of county commissioners to control the number and salary of a sheriff's employees through the budgetary process. See Robertson, 985 F. Supp. at 985; Johnson, 859 F. Supp. at 441. However, as pointed out in note 1, supra, the mere fact that the number or salary of employees can be controlled through the budgetary process does not mean that a board can also determine the hiring and firing of particular employees. And as the Colorado Supreme Court held in Schroeder, 381 P.2d at 822–23, a board of county commissioners (despite its budgetary authority) has no power to order the termination of a particular employee of a county officer.

-5-

which direction factor eleven (the intentions of the parties regarding the employment relationship) points. (Id. at 35.) I also agree with the majority's conclusion that factor six (the manner in which the employment relationship is terminated) weighs in favor of finding that the County is not plaintiff's employer because, under Colorado case law, the Sheriff's Department could have ignored any recommendation of reinstatement by the Personnel Review Board. (Id.)

According to the majority's analysis of factor eight of the Lambertsen test, it is unclear whether Bristol's work was "integral to the business of the County" because the Sheriff's Department is involved in law enforcement, which is one of the responsibilities of the County. (Id.) I conclude, however, that it is impossible as a matter of law for this factor to be resolved in favor of plaintiff. There is a significant and essential distinction between the Board's power to pass laws to be enforced by the Sheriff, a legislative function, and the Sheriff's powers to enforce those laws, an executive function. As the majority notes, the Sheriff's duties are thus no more integral to the business of the Board than the duties of the executive of any government are integral to the business of the legislature. (Id. at 36.)

I also disagree with the majority's conclusion that factor three (the provision of equipment and place of work) weighs in favor of finding that the County was plaintiff's employer. The majority argues that because the County

-6-

provided the jail and the equipment used in the jail by the Sheriff, the County might be considered plaintiff's employer. (Id. at 35.) But the Board is also responsible for "providing and maintaining adequate courtrooms and other court facilities" for state judicial officers. Colo. Rev. Stat. § 13-3-108. By the same logic, this would mean that the Board might be responsible for the hiring and firing of all judicial employees in Colorado, even though it is the state that funds the courts, and it is the judicial branch itself that establishes salaries, personnel policies, and its own budget. Id. §§ 13-3-104 to -106. I cannot conclude that factor three has any meaningful weight in this context.

The Colorado Constitution and Colorado state law have created a system of independent, separate constitutional county offices, with each office responsible for its own employees. Under the most important element of the Lambertsen test—the right to control a worker's performance—the evidence is overwhelming that the County had no control at all over Bristol. To my mind, this fact is what matters most. While it is true that no one factor is to be determinative in the Lambertsen analysis, control is the "main focus" of the inquiry, Lambertsen, 79 F.3d at 1028, especially when the other eleven Lambertsen factors are fairly evenly balanced.

Under Colorado law it was impossible for the County to have had control over the Sheriff's decision to fire plaintiff in this case. But a jury finding that the

County was the employer of plaintiff would effectively be a finding that the County could have had control over the Sheriff's decision. Such a finding would be counter to Colorado law and would have to be overturned on a motion for judgment as a matter of law. Therefore, I conclude that a proper application of Colorado constitutional and statutory law to the facts of this case would yield a Lambertsen analysis that holds as a matter of law that the County is not an employer of Bristol.

There is an additional way in which a jury finding in favor of plaintiff and against the County would undermine Colorado's local government structure. Without naming the County Assessor as a party, plaintiff seeks relief against the County because of the claimed discriminatory refusal by the County Assessor to hire him. (Majority Op. at 30–31.) Like the Sheriff, the Assessor is a constitutional officer whose position is established separately from the Board of County Commissioners. See Colo. Const. art. XIV, § 8 (election of assessors and other county officers). And like the Sheriff, Colorado law provides that the Assessor has the power to hire and fire his own employees. See Colo. Rev. Stat. § 30-2-104 (stating that the "county assessors . . . may appoint such deputies, assistants, and employees as shall be necessary"). The Colorado Supreme Court has held that, under this statutory provision, county officers have the independent power to determine who should fill positions within their departments, and that

the board of county commissioners may not interfere with those decisions. See Schroeder, 381 P.2d at 822–23 (interpreting a previous version of § 30-2-104 with identical relevant language, and holding that the county cannot effectively eliminate a position previously established by a county officer and approved by the board by refusing to fund the position). In suing the County over the Assessor's decision not to hire plaintiff, plaintiff is, in essence, asking that the Board be held liable for a hiring decision—the decision by the County Assessor not to hire plaintiff—over which it had no power under Colorado law.

## II

Principles of comity and federalism reinforce my analysis of this issue.

The above discussion of control over a sheriff's employees must be considered in the broader context of Colorado constitutional law. Division of authority over local government employees is part of a larger structure of county offices and county government that was established by the people of Colorado when they formed their constitution. See Colo. Const. art. XIV, §§ 6, 8.

Colorado courts have gone to great lengths to protect this constitutional scheme, and the state supreme court has repeatedly emphasized the independence of the various county constitutional offices both from other county officials and from the state legislature itself. For example, it has held unconstitutional state laws that attempted to place qualifications on holding the office of sheriff because

the constitution explicitly lists the qualifications that must be met by elected sheriffs. Jackson v. Colorado, 966 P.2d 1046, 1051 (Colo. 1998) (en banc). The Colorado Supreme Court has come to the same conclusion with respect to County Assessors. See Reale v. Bd. of Real Estate Appraisers, 880 P.2d 1205, 1211 (Colo. 1994) (en banc) ("The Colorado Constitution reserves no authority in the state legislature to change, add to, or diminish the qualifications for constitutionally created offices.").

Colorado county constitutional officers are officers with limited powers. For instance, officers such as sheriffs may not undertake actions that are not within their inherent or statutory authority. See, e.g., Douglass v. Kelton, 610 P.2d 1067, 1068 (Colo. 1980) (en banc) (holding that sheriffs had no power to issue permits for concealed weapons, because such power was not granted to them by statute, nor was it part of the inherent authority of a sheriff); Skidmore v. O'Rourke, 383 P.2d 473, 476–77 (Colo. 1963) (en banc) (holding for the same reasons that a county treasurer did not have the power to file suit to recover taxes owed).

A finding of fact by the jury that the County was plaintiff's employer would undermine the constitutional scheme for county offices created by the people of Colorado and protected by Colorado case law. A conclusion that Bristol, a member of the Sheriff's Department, is an employee of the County would make

the County responsible for finding an alternate position for Sheriff's Department employees who have been fired by the Sheriff. Not only would this undermine the independence of the Sheriff, but it would also create a strong incentive for the County to interfere with the Sheriff's constitutionally and statutorily protected right to hire and fire employees, because the County would be liable for those decisions. Moreover, because a jury finding for plaintiff would, in the future, require the County to seek alternate positions for Sheriff's Department employees, the County might even be forced to exceed its statutory and constitutional powers in order to fulfill that requirement.

Likewise, a finding by a jury that the County was liable for the Assessor's decision not to hire plaintiff would be contrary to Colorado law and would undermine Colorado's constitutional scheme for local government. Such a finding would provide an incentive for the County to interfere in the decision of the Assessor and other county officers to hire and fire employees, contrary to the provisions of Colorado Revised Statutes § 30-2-104. In essence, the federal courts would be holding a Colorado governmental agency liable for failing to exceed its statutory authority under Colorado law. There must be few, if any, actions that we could take that would be more corrosive of the sovereignty of the State of Colorado and of our federal system of government.

These considerations buttress my conclusion that the County cannot be Bristol's employer. As we have the ability, reasonably and plausibly, to apply a statute to avoid intrusion on state governmental functions we should do so. See Lyes v. City of Riviera Beach, 166 F.3d 1332, 1343–44 (11th Cir. 1999) (holding that "federalism and comity concerns . . . should play a significant role in determining whether to treat as one body two governmental entities that are separate and distinct under state law," and that "substantial deference" should be accorded to "a state lawmaking body's determination of whether two or more governmental entities are separate and distinct" for Title VII purposes); cf. Gregory v. Ashcroft, 501 U.S. 452, 470 (1991) (stating that where federal law is ambiguous it should be interpreted in a manner to avoid intrusion on state government functions). I would hold that, as a matter of law, the County is not an employer of Bristol, and that the County therefore had no obligation to accommodate Bristol.

This presents the basis of my dissent.

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 12 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

GARY BRISTOL,

      Plaintiff - Appellee,

v.

THE BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF CLEAR CREEK and
DON KRUEGER, in his official
capacity as the Sheriff of the County
of Clear Creek,

      Defendants - Appellants,

_____

COUNTY SHERIFFS OF
COLORADO, INC.,

      Amicus Curiae.

No. 00-1053

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 98-Z-1743)**

_____

Robert M. Liechty, Denver, Colorado, for Defendants-Appellants.

Evan S. Lipstein of Law Offices of Evan S. Lipstein, Lakewood, Colorado, (John
W. Berry, Denver, Colorado, with him on the brief), for Plaintiff-Appellee.

Josh A. Marks and Andrew D. Ringel, Hall & Evans, L.L.C., Denver, Colorado, filed a brief on behalf of the Amicus Curiae.

---

Before **TACHA,** Chief Judge**, SEYMOUR, EBEL, KELLY, HENRY, BRISCOE, LUCERO, MURPHY, HARTZ** and **O'BRIEN,** Circuit Judges.[*]

---

**LUCERO**, Circuit Judge.

---

We granted en banc rehearing in this case to further consider whether the Board of County Commissioners of Clear Creek County, Colorado ("Board") owes a duty to provide accommodation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., to Gary Bristol, an employee of the County Sheriff. We hold that, because under Colorado law a Board lacks the power to control the hiring, termination, or supervision of a Sheriff's employees, or otherwise control the terms and conditions of their employment, there can be no basis upon which a jury could determine that the Board owes such a duty. Our prior panel opinion is vacated in part, and we reverse the district court's ruling on this issue and remand with instructions to dismiss the action as to the Board.

---

[*] Judge Michael W. McConnell joined the court after oral argument in the instant case and did not participate in this decision.

# I

From February 1990 until May 1996, Gary Bristol worked as a confinement officer for the Clear Creek County Sheriff, Don Krueger. In March of 1996, Bristol was treated for a heart condition that, according to his cardiologist, would prevent him from having contact with inmates or engaging in severe or strenuous activity. Bristol was temporarily reassigned to light duty in the jail, but his cardiologist later wrote to the Sheriff to inform him that Bristol's heart condition would restrict his activities indefinitely. On May 20, 1996, the Sheriff discharged Bristol on the grounds that Bristol could no longer perform the essential functions of his job as a confinement officer and the Sheriff could not accommodate his disability on a permanent basis. Bristol appealed to the County Personnel Review Board ("PRB"). The PRB upheld his dismissal, but encouraged him to apply for available Clear Creek County positions, suggesting he might be given a hiring preference if he was qualified for a County job opening.

At the time of Bristol's PRB hearing, there were at least two job openings in offices of Clear Creek County officials: equipment operator in the road and bridge department, and appraiser-trainee in the County Assessor's office.[1] Bristol interviewed for both jobs. Bristol's cardiologist, however, told him that he could

---

[1] A position later became available in the Sheriff's Office for which Bristol was not considered, but this is not relevant to the issue whether the Board had a duty to provide accommodation to Bristol.

not perform the duties of an equipment operator, and Diane Settle, the County Assessor, did not hire Bristol for the appraiser-trainee position. After working for two years in non-County positions, Bristol filed suit against the Board and the Sheriff in August 1998. Among other claims, Bristol alleged that both the Board and the Sheriff were his employers for ADA purposes and illegally discriminated against him by refusing to offer him a job that did not exceed his physical limitations. Bristol sought reinstatement, back pay, attorney's fees, other damages, and costs.

At trial, defendants moved for judgment as a matter of law, arguing that only the Sheriff was Bristol's employer. The district court ruled that both the Sheriff and the Board of County Commissioners were Bristol's employers as a matter of law. A jury returned a verdict for Bristol, awarding him damages and attorney's fees. Defendants appealed. Exercising appellate jurisdiction pursuant to 28 U.S.C. § 1291, a panel of this circuit held, over a dissent, that the district court should have allowed the jury to determine whether "the County [i.e., the Board] can properly be considered Bristol's employer." Bristol v. Bd. of County Comm'rs, 281 F.3d 1148, 1166 (10th Cir. 2002). The dissent argued that, as a matter of law, the Board is not an employer of Bristol and had no duty to accommodate Bristol's disability. Id. at 1173 (Lucero, J., dissenting). We

- 4 -

granted en banc rehearing on the question of the Board's status as an alleged employer of Bristol.[2]

## II

Because the district court denied defendants' motion for judgment as a matter of law, in which defendants argued, inter alia, that only the Sheriff was Bristol's employer,[3] this appeal turns on whether the district court properly disposed of the Rule 50 motion. "We review de novo a district court's disposition of a motion for judgment as a matter of law, applying the same standard as the district court." Wilson v. Tulsa Junior College, 164 F.3d 534, 536 (10th Cir. 1998). "We must enter judgment as a matter of law in favor of the moving party if there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law." Baty v. Willamette Indus., Inc., 172 F.3d

---

[2] It is important to point out what the instant case is not about. We are not faced with a situation where a judgment has been levied against a County official and the County must levy a tax under Colo. Rev. Stat. § 30-25-104 to pay for the judgment. Nor must we decide whether Bristol, an employee of the Sheriff, can be called a "County employee" for any purpose other than ADA accommodation. Employees of the County Sheriff are, of course, "County employees" in the same sense that employees of the federal judiciary are "federal employees." Such common usage has no bearing on our construction of the ADA. The instant case is about whether the Board can be considered an employer of Bristol so as to trigger the accommodation requirements of the ADA.

[3] The Board and the Sheriff were represented by the same attorney and filed a joint motion for judgment as a matter of law. Among other claims, they argued that only the Sheriff was Bristol's employer.

1232, 1241 (10th Cir. 1999) (alterations in original) (quotation omitted).  When a defendant seeks judgment as a matter of law, the controlling question "is whether the plaintiff has arguably proven a legally sufficient claim."  Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1241 (10th Cir. 2001), cert. denied, 122 S. Ct. 1435 (2002).  In the present case, whether the Rule 50 motion was properly disposed of depends, in turn, on the construction of the ADA and its definition of "employer."

The ADA requires a "covered entity" to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."  42 U.S.C. § 12112.  An "employer" is a "covered entity" under the ADA.  Id. § 12111. "Employer" is defined, as in Title VII, as "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year."  Id.; see also Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999) (noting the similarity between the definitions of "employer" under the ADA and Title VII).

When courts construe statutory terms related to employment, it is often in the context of determining whether a particular entity is an "employee" or an "independent contractor."  See, e.g., Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 751–53 (1989) (applying common-law principles to determine

whether a sculptor was an employee or an independent contractor); <u>Oestman v. Nat'l Farmers Union Ins. Co.</u>, 958 F.3d 303, 305 (10th Cir. 1992) (asking the same question with respect to an insurance agent).  In distinguishing employees from independent contractors for purposes of social legislation, courts have historically examined both the control the alleged employer has over the alleged employee and the "economic reality" of the situation, <u>Bartels v. Birmingham</u>, 332 U.S. 126, 130 (1947), including the permanency of the relation and the skill required.  Courts have accordingly adopted a "hybrid test" that considers both control and multiple "economic reality" factors.  <u>Mares v. Marsh</u>, 777 F.2d 1066, 1067 (5th Cir. 1985); <u>see also</u> <u>Spirides v. Reinhardt</u>, 613 F.2d 826, 831–32 (D.C. Cir. 1979) (elaborating the eleven factors of the "hybrid test" in the Title VII context).[4]

---

[4]  Under the hybrid test, the factors used to determine whether a plaintiff is an employee or an independent contractor include the employer's right to control the "means and manner" of the worker's performance as well as:

> (1) the kind of occupation at issue, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the employer or the employee furnishes the equipment used and the place of work; (4) the length of time the individual has worked; (5) the method of payment, whether by time or by job; (6) the manner in which the work relationship is terminated; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the

(continued...)

We originally adopted the hybrid test in its intended context, i.e., for the purpose of distinguishing an employee from an independent contractor. Oestman, 958 F.2d at 305. In subsequent cases, however, we have used the hybrid test to solve a different problem: determining which of two entities was a plaintiff's "employer" under Title VII. See, e.g., Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1328–29 (10th Cir. 2002); Lambertsen v. Utah Dep't of Corr., 79 F.3d 1024, 1028 n.1 (10th Cir. 1996). Our prior panel opinion applied the hybrid test in the instant case, following Lambertsen and its progeny. Bristol, 281 F.3d at 1164. We take this opportunity, sitting en banc, to clarify that the hybrid test does not provide an appropriate framework in the present situation, where there is no allegation that Bristol is an independent contractor of the Board.

Courts have elaborated two other tests that are more applicable to the present context: the joint-employer test and the single-employer test. First, a plaintiff who is the employee of one entity may seek to hold another entity liable by claiming that the two entities are joint employers. This joint-employer test acknowledges that the two entities are separate, but looks to whether they co-determine the essential terms and conditions of employment. See, e.g., Graves v.

<hr>

[4](...continued)
"employer" pays social security taxes; and (11) the intention of the parties.

Oestman, 958 F.2d at 305 (quoting Spirides, 613 F.2d at 831).

Lowery, 117 F.3d 723, 727–28 (3d Cir. 1997); Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1359–61 (11th Cir. 1994); Rivas v. Federacion de Asociaciones Pecuarias de Puerto Rico, 929 F.2d 814, 819–21 (1st Cir. 1991). Second, a plaintiff who is the employee of one entity may seek to hold another entity liable by arguing that the two entities effectively constitute a single employer. See, e.g., Romano v. U-Haul Int'l, 233 F.3d 655, 662 (1st Cir. 2000); Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240 (2d Cir. 1995); EEOC v. Wooster Brush Co. Employees Relief Ass'n, 727 F.2d 566, 571–72 (6th Cir. 1984). Although these two tests are sometimes confused, they differ in that the single-employer test asks whether two nominally separate entities should in fact be treated as an integrated enterprise, while the joint-employer test assumes that the alleged employers are separate entities. See Clinton's Ditch Coop. Co. v. NLRB, 778 F.2d 132, 137–38 (2d Cir. 1985) (explaining the difference between the two tests); see also Rivas, 929 F.2d at 820 n.16 (same).

Unlike the hybrid test, both the joint-employer test and the single-employer test are designed for situations where there is more than one alleged employer.[5]  In

_____

[5]  In various factual contexts, other tests have been followed by the courts, such as the agency test, the alter ego test, and the instrumentality test. See Frank v. U.S. West, Inc., 3 F.3d 1357, 1362 n.2 (10th Cir. 1993).  These tests are often helpful in dealing with a subsidiary and its parent corporation, when the plaintiff seeks to pierce the corporate veil and hold the parent liable under a federal statute.  Because the joint-employer test and single-employer test are most

(continued...)

the present case, Bristol did not ask us to apply either the joint-employer test or the single-employer test, relying instead on the hybrid test we followed in Lambertsen.  Because the hybrid test is not applicable to the facts of the instant case, however, we proceed to analyze whether the Board can be considered Bristol's employer under either the joint-employer test or the single-employer test.

### III

Courts applying the joint-employer test treat independent entities as joint employers if the entities "share or co-determine those matters governing the essential terms and conditions of employment."  Virgo, 30 F.3d at 1360.  In other words, courts look to whether both entities "exercise significant control over the same employees."  Graves, 117 F.3d at 727 (applying the joint-employer test to determine if state-court clerks were employees of the county as well as the judicial branch); see also Virgo, 30 F.3d at 1360 (looking to control to determine whether a hotel and the partnership that owned it were "joint employers" under Title VII).

Under the Colorado constitution, the County Sheriff is a distinct position, separate from the Board of County Commissioners.  See Colo. Const. art. XIV, § 6 (election of County Commissioners); § 8 (election of Sheriffs and other county

---

[5](...continued)
applicable to the present factual context, we will limit our analysis to these two tests.

- 10 -

officers).  Sheriffs have exclusive control over the hiring and firing of their employees, Colo. Rev. Stat. § 30-10-506, and even self-imposed limitations on their right to discharge employees at will are invalid, Seeley v. Bd. of County Comm'rs, 791 P.2d 696, 700 (Colo. 1990) (en banc).  Most important to control over the terms and conditions of an employment relationship is the right to terminate it under certain circumstances—a power exclusively vested in the Colorado Sheriffs with respect to their deputies.  Colo. Rev. Stat. § 30-10-506; Seeley, 791 P.2d at 699.

Because the Board of County Commissioners has no control over the Sheriff's employees, the Board is not liable for negligent acts of the Sheriff's employees.  See Tunget v. Bd. of County Comm'rs, 992 P.2d 650, 652 (Colo. Ct. App. 2000).  While the Sheriff could fire Bristol at his pleasure, the Board could not fire Bristol even for good cause.  We agree with the Colorado Court of Appeals that "[t]he sheriff, not the county or the Board, has the right of control with respect to the deputies."  Id.

Bristol relies on a group of Title VII cases from various district courts, in which a County's budgetary control over the Sheriff's office was held sufficient to make the County an "employer."  See, e.g., Spencer v. Byrd, 899 F. Supp. 1439, 1440–41 (M.D.N.C. 1995); Johnson v. Bd. of County Comm'rs, 859 F. Supp. 438, 440–41 (D. Colo. 1994); Manley v. Mobile County, 441 F. Supp. 1351, 1355–56

- 11 -

(S.D. Ala. 1977). While the Clear Creek County Board of County Commissioners does have the authority to adopt an overall budget for all County officials, including Sheriffs, this budgetary power gives the Board of County Commissioners no right to force a constitutionally independent official to hire or fire an employee. See, e.g., Schroeder v. Bd. of County Comm'rs, 381 P.2d 820, 822–23 (Colo. 1963) (holding that once a Board of County Commissioners has approved the salary for an employee of a county official, it cannot use its budgetary power to force the official to fire that employee, where the official's power to hire and fire was established by state law). Evidence at trial established that the Board's budgetary authority could not be used to influence hiring and firing decisions. Bristol could have been fired only by the Sheriff, not by the Board, just as it was the Sheriff and not the Board who hired him. Budgetary power, in and of itself, does not establish the control necessary to treat the Sheriff and the Board as joint employers.

Furthermore, no evidence was introduced suggesting that the Board had any de facto authority over the Sheriff's employment decisions.[6] Bristol's failure to

---

[6] In the present case, the Sheriff did choose to have his decision reviewed by the County PRB, but this was a voluntary choice and the PRB's decision was merely advisory. Bristol's counsel conceded at oral argument before the en banc court that the PRB had no authority to reverse the Sheriff's termination decision, characterizing the PRB's "authority" as advisory. This conclusion is in accord with the Colorado Supreme Court's decision in Seeley, 791 P.2d at 700.

allege facts indicating that the Board had de facto responsibility over his employment distinguishes this case from Graves. In Graves, a group of state-court clerks brought a Title VII claim against Dauphin County, Pennsylvania, arguing that the county and the Pennsylvania judicial branch should be treated as joint employers. 117 F.3d at 723, 727. Because the clerks alleged that the county "assumed *de facto* responsibility" over their employment, the Third Circuit found sufficient evidence for the jury to determine the county's liability under the joint-employer theory. Id. at 727–28 ("[T]he Clerks claim that the County, through its funding, actions, and policies, exercised the requisite control over the daily employment activities of the Clerks to incur liability as a co-employer."). According to the clerks in Graves, they were told that "they were subject to termination and/or reinstatement by the County and that two of them were hired by the County." Id. at 729. By contrast, Bristol does not allege that he was ever informed that the County had the power to terminate his employment in the Sheriff's office—not surprisingly, because the County had no such power. We conclude that Bristol cannot satisfy the joint-employer test.

Alternatively, Bristol could seek to establish the Board's liability by showing that the Board and the Sheriff effectively constituted a single employer. Courts applying the single-employer test generally weigh four factors: "(1) interrelations of operation; (2) common management; (3) centralized control

of labor relations; and (4) common ownership and financial control." Wooster Brush Co., 727 F.2d at 571. Courts generally consider the third factor—centralized control of labor relations—to be the most important. See, e.g., Romano, 233 F.3d at 666 ("[T]here is near unanimity that control of labor operations i.e., control of employment decisions, is the most important of the four factors."); Skidmore v. Precision Printing & Packaging, Inc., 188 F.3d 606, 617 (5th Cir. 1999) ("[C]ourts have focused almost exclusively on one question: which entity made the final decisions regarding employment matters relating to the person claiming discrimination?"). Thus, the extent to which the Board can be said to control the labor relations of the Sheriff's employees is highly determinative under the single-employer test. As discussed above, the Board had no such control over the Sheriff's employees.

Of the other factors applied by the courts under the single-employer test, the fourth—common ownership and financial control—is clearly irrelevant to a case involving governmental entities, which do not issue stock and are not owned by private parties. Moreover, no evidence has been introduced suggesting that the second factor—common management—is met here. Only the first factor, interrelations of operation, could conceivably help Bristol. Evidence at trial showed that the Board had budgetary authority over the Sheriff's office and the Sheriff used county services for administrative purposes. Nevertheless, in light of

the independence of the Sheriff's office from the Board under the Colorado constitution, even the first factor does not weigh heavily in Bristol's favor. In any event, the first factor cannot counterbalance the Board's complete lack of control over labor relations in the Sheriff's office. We conclude that, in light of the evidence introduced in the present case, Bristol cannot establish that the Board and the Sheriff effectively constitute a single employer.

Bristol argues that Owens v. Rush, 636 F.2d 283 (10th Cir. 1980), imposes liability on the Board in the present case. Owens did conclude that a Kansas Sheriff was an agent of the County, but for the sole purpose of satisfying the fifteen-employee jurisdictional requirement of Title VII. 636 F.2d at 286–87. No such jurisdictional question is at issue in the present case, because the Sheriff of Clear Creek had more than fifteen employees. Because we are presently faced with a case where the jurisdictional requirement is indisputably met, Owens is not implicated.

Bristol also cites several cases from other circuits in support of his contention that the Board is his employer. Four of these cases involve § 1983 actions in which the acts of the Sheriff were held to set the "official policy" of the County, thus making the County liable under § 1983 for the Sheriff's unconstitutional actions and those of the Sheriff's employees. See Lucas v. O'Loughlin, 831 F.2d 232, 233 (11th Cir. 1987) (termination in violation of First

Amendment); <u>Weber v. Dell</u>, 804 F.2d 796, 802 (2d Cir. 1986) (strip search); <u>Blackburn v. Snow</u>, 771 F.2d 556, 571 (1st Cir. 1985) (same); <u>Marchese v. Lucas</u>, 758 F.2d 181, 188–89 (6th Cir. 1985) (assault by deputies). These cases do suggest that counties can be held liable for the misdeeds of Sheriffs and their employees when the Sheriff is held to set "official policy" for the county.

In the present case, however, the Sheriff was not setting "official policy" in firing Bristol, except to the extent that requiring employees to be able to perform their jobs can be called a "policy." Bristol lost his job because he could no longer perform it. This situation is different than those presented in the § 1983 cases cited by Bristol, which generally involve a pattern of misconduct approved by the Sheriff. Accordingly, the § 1983 cases cited by Bristol are not analogous to the present case, and we do not consider them persuasive.

## IV

In sum, the Board had no duty as an "employer" under the ADA to provide reasonable accommodation to Bristol. As a general rule, "determining whether an entity qualifies as an employer is a fact issue for the jury." <u>Bristol</u>, 281 F.3d at 1165. Juries are normally entrusted to apply the appropriate legal standard to the facts of each case. In the instant case, however, our conclusion that neither the joint-employer test nor the single-employer test can be satisfied requires judgment as a matter of law:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Fed. R. Civ. P. 50. Given the absence of an employment relationship between Bristol and the Board, there is no "legally sufficient evidentiary basis for a reasonable jury to find" that the Board was Bristol's employer. Defendants' motion for judgment as a matter of law should have been granted on this point, and our prior panel opinion should have remanded with instructions to dismiss the Board from this case. In all other respects, our prior opinion stands.

## V

Our prior panel opinion is **VACATED IN PART**, the judgment of the district court is **REVERSED**, and the case is **REMANDED** with instructions to dismiss this action as to the Board.