The Estate of Don Douglas IWANSKI, Deceased, Plaintiff–Appellant,

v.

Howard RAY, Deputy Warden, Northeast Oklahoma Correctional Center; Charles Galipeau, Chief of Security, Northeast Oklahoma Correctional Center; and Troy Alexander, Unit Manager, Northeast Oklahoma Correctional Center, Defendants–Appellees.

No. 01–5046.

United States Court of Appeals, Tenth Circuit.

Aug. 9, 2002.

Before TACHA, Chief Judge, HENRY, and BRISCOE, Circuit Judges.

**ORDER AND JUDGMENT** *

HENRY, Circuit Judge.

This is an appeal in a suit involving a 42 U.S.C. § 1983 claim brought by the estate of Don Douglas Iwanski, an inmate who was murdered at the Northeast Oklahoma Corrections Center in 1995. Mr. Iwanski's mother, Judy Iwanski, sued certain prison officials on behalf of the estate, claiming they violated her son's Eighth Amendment rights by failing to protect him from the conditions that led to his death. She now appeals the jury's decision in favor of the defendants. Specifically, we are asked to determine whether the appellant was entitled to judgment as a matter of law, whether the trial judge erred in not admitting two types of evidence, and whether the trial judge made inappropriate comments characterizing the appellant's argu-

ments at trial. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I. Background

At the time of Mr. Iwanski's death, Mr. Iwanski and Kevin White were incarcerated at the Northeast Oklahoma Correctional Center ("NOCC"), a minimum security facility operated by the Oklahoma Department of Corrections. The NOCC began operating in December, 1994, while parts of the facility were still under construction. As part of ongoing construction and expansion, the NOCC took over one floor of Adams Hall from Eastern State Hospital, which is adjacent to the NOCC. Because the rooms at Adams Hall were larger than those normally used at the NOCC, prison officials placed beds into the rooms unstacked. The two-foot long steel pipes previously used to stack the beds were placed into the closet of each of the inmates' rooms in lieu of being secured.

On February 4, 1995, Mr. White, while intoxicated, took one of the stacking posts from his building and boarded a bus to Building 14, the building in which Mr. Iwanski was housed. Mr. White had previously been housed in Building 14 but had recently been transferred to Adams Hall. The driver of the bus questioned whether Mr. White was still housed in Building 14 and directed him to remain on the bus when they arrived at the building. Because Mr. White had concealed the post, the driver did not see it in his possession. Contrary to the driver's orders, Mr. White exited with the other inmates, and the driver subsequently lost sight of him. Thereafter, Mr. White went to Mr. Iwanski's room—where Mr. Iwanski was sleeping—and struck Mr. Iwanski on the head

---

* This order and judgment is not binding precedent, except under the doctrines of res judicata, collateral estoppel, and law of the case. The court generally disfavors the citation of

orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

several times with the steel post. Although the bus driver and another inmate performed CPR on Mr. Iwanski in the ambulance on the way to the hospital, Mr. Iwanski died soon after his arrival.

Ms. Iwanski filed suit pursuant to 42 U.S.C. § 1983 on behalf of the estate of her deceased son against the Department of Corrections ("DOC") and various NOCC officials. The district court granted summary judgment to the defendants in the suit, and this court affirmed in part and reversed in part that decision, allowing the suit to proceed against three of the officials with respect to whether they were deliberately indifferent to the risk created by providing Mr. White access to the steel bed leg used against Mr. Iwanski. *See Iwanski v. ODOC*, 201 F.3d 448 (10th Cir. 1999) (unpublished disposition). Ms. Iwanski thereafter resumed the suit against the three defendants named in this appeal, all three of whom were administrators responsible for preparing Adams Hall, moving the inmates there, and otherwise monitoring safety at the NOCC.

Ms. Iwanski's suit claimed that the administrators violated her son's Eighth Amendment rights by deliberately ignoring the significant risk of substantial harm posed by the presence of the steel stacking posts. A jury trial was held in February 2001. At the conclusion of the defendants' case, Ms. Iwanski moved for judgment as a matter of law, and the appellant suggests the court declined to rule on the matter.

We read the record as suggesting that the motion was denied.[1] The jury subsequently determined that the defendants were not liable for the alleged constitutional violation.

Also during the trial the judge refused to admit two types of evidence, the first being post-mortem photographs of Mr. Iwanski presented to show the deadly nature of the steel pipes, and the second being a letter to Mr. Galipeau that was intended to show Mr. Galipeau was aware of security concerns at the NOCC. The appellant also alleges that the trial judge made inappropriate comments to the jury regarding the dangerousness of the pipe.

Ms. Iwanski appeals on three bases. First, she appeals the judge's failure to rule in her favor when judgment as a matter of law was requested. Second, she appeals the judge's decision to keep the two kinds of evidence from the jury. Third, she appeals the outcome of the case based on the judge's comments at trial. We now proceed to address each of these issues.

## II. Discussion

### A. Request For Judgment As A Matter Of Law

We review de novo a district court's ruling on a motion for judgment as a matter of law. *See Bristol v. Board of County Comm'rs*, 281 F.3d 1148, 1161 (10th Cir.

---

1. The transcript reveals the following colloquy:

> MR. DAVIS: Secondly, Your Honor, just as [a] matter of—to bring up plaintiff's case-in-chief, we also move for judgment [as a matter of law] in this case.
> THE COURT: Are you really serious about that second motion in regards to plaintiff's case-in-chief?
> MR. DAVIS: We also move for judgment [on that topic.]

> THE COURT: How long do you think it would take the Tenth Circuit Court of Appeals to reverse me on that? You think it would take over five minutes? I hate to see a lawyer make any kind of a motion that's silly.
> MR. DAVIS: Okay.
> THE COURT: That is a silly motion....

Aplt's App. vol. III, at 610–11. We consider the district court judge's response to be a denial of the plaintiff-appellant's motion for judgment as a matter of law.

2002) (petition for rehearing en banc on other grounds granted July 2, 2002). In doing so, we apply the same standard as the district court. *See id.* "Judgment as a matter of law is appropriate only '[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party.' " *Id.* (quoting Fed.R.Civ.P. 50(a)(1)). " '[A] court may grant the motion only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.' " *Id.* (quoting *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1339 (10th Cir.1998)).

In order to determine whether the appellant was entitled to judgment as a matter of law, we must begin by examining the basis for the relevant legal claim. To prevail on a claim of failure to protect an inmate under the Eighth Amendment, a plaintiff must satisfy a two-step analysis: she must show (1) that the inmate was incarcerated under conditions posing a substantial risk of serious harm and (2) that the prison officials subjectively knew of and disregarded that safety risk. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *accord Grimsley v. MacKay,* 93 F.3d 676, 680–81 (10th Cir.1996).

In attempting to satisfy these requirements, plaintiff did not present any evidence suggesting that her son faced a specific risk of harm from Mr. White. Indeed, the evidence presented at trial did not explain the connection between the two inmates or Mr. White's motivation for assaulting Mr. Iwanski. Nor was there any evidence that Mr. Iwanski, his family, or other inmates had alerted prison employees to the possibility that Mr. Iwanski was at risk of harm from Mr. White. Instead, the plaintiff focused more broadly on the threat posed to all inmates at the NOCC as a result of the combination of (a) Mr. White's alleged violent background and personality, (b) the alleged likelihood that some inmate, including Mr. White, would use one of the stacking posts as a weapon against another inmate, and (c) the alleged lax security procedures maintained by NOCC employees. As explained below, the evidence on these issues was conflicting and legally sufficient to allow the jury to find in favor of defendants.

*Mr. White's background and personality*

In an attempt to establish that Mr. White was prone to violence, plaintiff presented undisputed evidence that Mr. White previously had served time for assault and battery upon a police officer and, at the time of the assault on Mr. Iwanski, was serving a sentence for assault and battery with a dangerous weapon after former conviction of a felony. Further, plaintiff presented undisputed evidence that Mr. White had a history of alcohol abuse (including while incarcerated), was intoxicated at the time of the assault, and had engaged in three fights (with two other inmates) in the twenty-four hour period preceding the assault. Plaintiff also presented evidence indicating that Mr. White's "field file," maintained by officials at the NOCC, contained information that Mr. White had "a history of assaultive behavior, particularly when under the influence of alcohol." Aplt's App. vol. I, at 264.

To counter this evidence, the defendants presented evidence suggesting that Mr. White had suppressed successfully, or at least hidden from DOC employees, any violent tendencies he may have had. In particular, defendants presented evidence that Mr. White had not been disciplined for any violent conduct while incarcerated and that the majority of his disciplinary infractions were for relatively minor misconduct, such as "mouthing off to an offi-

cer" or "not showing up for [an inmate] count." *Id.* at 273. In addition, defendants presented evidence that, during his period of confinement as a trustee in Adams Hall, Mr. White had been doing an "excellent job as [a] unit orderly." *Id.* at 277. The defendants also presented evidence indicating that NOCC employees had not observed any of the pre-assault fights engaged in by Mr. White and that none of these fights had been reported to the staff by other inmates. Lastly, the defendants presented evidence disputing the plaintiff's suggestion that either the nature of Mr. White's crimes or his psychological profile should have prevented his placement in the trustee unit. *See id.* vol. II, at 385–88.

*Likelihood of an inmate using a stacking post as a weapon*

The plaintiff attempted to establish that, due to their nature and availability, the stacking posts were likely to be used by an inmate as a weapon. In particular, all of the defendants admitted, under examination by plaintiff's counsel, that a large number of ordinary items could be and had been used by inmates as weapons, and that the stacking posts in particular could be used as such. *See, e.g., id.* vol. I, at 129, 138 (testimony of Larry Fields). The plaintiff also presented evidence establishing that the DOC had classified a large number of items, including items similar in shape and size to the stacking posts, as contraband.

To counter the plaintiff's evidence, the defendants personally testified that it would have been impractical, and indeed impossible, for them to have classified as contraband every item that could be used as a weapon. The defendants also presented evidence indicating that the trustees housed in Adams Hall were unlikely to use the stacking posts, or any other items, as a weapon. For example, Larry Fields

(the former director of DOC), testified that all of the trustees had worked their way through the DOC classification system and had essentially earned their way to the greater privileges and freedoms afforded them in Adams Hall. *See id.* at 164. Mr. Fields further testified that the trustees were generally closer than other inmates to their release dates. *See id.* Thus, Mr. Fields testified, he was not concerned about the trustees' potential misuse of the stacking posts because of the significant effect such behavior would have on their classification level and release date. *See id.* at 165. John Middleton, the warden at the NOCC at the time of the assault, testified that he had supervised a similar trustee unit for approximately six or seven years prior to the formation of the NOCC and that he "[did not] remember" any trustee committing an assault with a weapon. *Id.* at 215. Mr. Middleton further testified that the assault on Mr. Iwanski was the only fatal assault that occurred during his tenure at the NOCC. *See id.* at 219. John Hart, a sergeant at the NOCC at the time of the assault, testified that he previously had worked at a minimum security facility in Tulsa where similar bunk beds were used and that they did not experience any problems with inmates using, or attempting to use, the stacking posts as weapons. *See id.* vol. II, at 444. Finally, Howard Ray, the deputy warden at the NOCC at the time of the assault, testified that most assaults in the facility occurred with fists and that Mr. Iwanski's death was the only fatality that occurred under his supervision during his twenty-six year career in corrections. *See id.* vol. III, at 588, 597.

*Security procedures followed at the NOCC*

The plaintiff attempted to establish that the security procedures followed at the NOCC, and in Building 14 in particular, were lax at the time of the assault. For

example, the plaintiff presented evidence indicating that the "post activity logs" for Building 14, which were supposed to reflect all activities by the correctional officers in the unit, failed to establish that officers conducted the required number of inmate "counts" or unit "walk-throughs" required under DOC policies and procedures. The plaintiff also presented evidence from former inmates at the NOCC who testified that the correctional officers in Building 14 tended to stay in their offices, thereby leaving the inmates with the freedom and ability to engage in various types of misconduct (e.g., drinking alcohol, gambling, and fighting).

The defendants countered the plaintiff's evidence in several ways. First, defendants presented evidence suggesting that the "post activity log" for Building 14 did not accurately reflect every inmate "count" or unit "walk-through" that actually occurred. *See, e.g., id.* vol. II, at 401 (testimony of Charles Galipeau). Second, the defendants presented evidence indicating that, at the time of the assault on Mr. Iwanski, both correctional officers and their supervisors regularly patrolled Building 14. *See id.* at 323 (testimony of Howard Ray that walk-throughs occurred continuously during the course of each day). Third, the defendants presented undisputed evidence that there was a security mechanism in place at the NOCC under which officials could place an inmate in protection if he so desired. *See id.* vol. I, at 226. Finally, the defendants all testified that, at the time of the assault on Mr. Iwanski, they had no serious concerns about security at the NOCC. *See id.* vol. II, at 400 (testimony of Mr. Galipeau).

■ Based upon the above-described evidence, we conclude there was a legally sufficient evidentiary basis for a reasonable jury to find in the defendants' favor on the "risk of substantial harm" element of the plaintiff's claim. Although the evidence was certainly not one-sided, a jury could reasonably have concluded that Mr. Iwanski did not face a substantial risk of serious harm from Mr. White in particular, from any other inmate who might have had access to the stacking posts, or as a result of the alleged lax security procedures in place in Building 14. Thus, the appellant was not entitled to judgment as a matter of law.

## B. Evidentiary Rulings

This court reviews a district court's exclusion of evidence for an abuse of discretion and "will not disturb its determination absent a distinct showing the decision was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *Cartier v. Jackson,* 59 F.3d 1046, 1048 (10th Cir. 1995). Moreover, error in the exclusion of evidence is harmless unless the party asserting error demonstrates the substantial rights of the parties were affected. *See Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1518 (10th Cir.1995); *see also* Fed. R.Evid. 103(a).

There are two types of evidence that the appellant argues should have been admitted. First, the appellant offered autopsy photographs of the victim to show the nature of the injuries and hence the dangerousness of the metal pipe in question. The trial judge refused to admit the photographs, deciding that they were inflammatory, unnecessary, and prejudicial. The appellant suggests that worse photographs have been admitted in other cases and that the exclusion of these photographs was therefore error. Second, the appellant sought to introduce a letter addressed to Mr. Galipeau. The letter contained information highlighting extensive drug use and security concerns at the NOCC. The letter was not proposed for the truth of its content but rather to show Mr. Galipeau's

knowledge of the conditions at the NOCC and possibly to impeach his testimony. Nevertheless, the court refused to admit the letter.

■ With respect to the photographs, there is little doubt that autopsy images of a victim can be overly prejudicial. In the present case, there was ample testimony of the extent of damage caused by the pipe, and thus admission of the photographs would only have served to reinforce this evidence while at the same time risk inflaming the passions of the jury. At the very least, we cannot see how the trial judge's decision to keep this evidence from the jury reveals a manifest error in judgment indicative of an abuse of discretion. *Cf. United States v. Goseyun*, 789 F.2d 1386, 1387 (9th Cir.1986) (per curiam) ("The trial judge's exercise of discretion in balancing the prejudicial effect and probative value of photographic evidence of this type is rarely disturbed."). Ms. Iwanski is not entitled to reversal of the trial court's ruling on this ground.

The matter of the letter addressed to Mr. Galipeau is another issue. The trial judge did not admit the letter, calling it hearsay and also noting that no evidence was produced to show whether the letter had been read by Mr. Galipeau prior to the attack on Mr. Iwanski. Aplt's App. vol. II, at 375–78. Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Here, the relevant question is the purpose for which the letter to Mr. Galipeau was being offered.

■ Since the appellant's attorney noted that the letter was not being offered to prove the truth of its contents, *see* Aplt's App. vol. II, at 378, we can see two possible purposes for offering the letter. One possibility is that the letter was being offered to show that Mr. Galipeau, prior to the date of Mr. Iwanski's murder, had

been put on notice that there might be security concerns at the NOCC. The other is that the letter was being offered to show that Mr. Galipeau had requested a report from the author of the letter regarding the conditions at the NOCC. Because neither of these possibilities involve the letter being offered to prove the truth of its contents, the letter was not properly kept out of evidence as hearsay, although we agree with the district court's concern that absent evidence of when Mr. Galipeau actually received the letter, a proper foundation for the letter may have been lacking. *See* Aplt's App. vol. II, at 377.

Regardless of whether the letter was improperly kept out of evidence, the appellant is not entitled to relief unless she can show that "a substantial right [was] affected...." Fed.R.Evid. 103(a); *see also Gomez*, 50 F.3d at 1518. An error affects the substantial rights of a party if it had a "substantial influence on the outcome or which leaves one in grave doubt as to whether it had such effect." *United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir. 1999) (internal quotations and alteration omitted). Here, the appellant complains that not being able to admit the letter caused prejudice to her case, leaving the jury with a sense that her witnesses were not credible and that her theory lacked coherence and continuity. It is unclear, however, how the appellant's theory would have gained credibility through admission of the letter when the appellant had the opportunity to call both the letter's author and its recipient as witnesses at trial. Further, the appellant in fact examined Mr. Galipeau before the jury regarding whether he had asked the letter's author to inquire into the safety of the NOCC and whether he had concerns about the safety of the facility prior to Mr. Iwanski's murder. *See* Aplt's App. vol. II, at 368–95. Hence, the letter's admission would have

been cumulative. For these reasons, the appellant has not convinced us that the outcome of the trial is in grave doubt because of the ruling on this matter, and therefore relief is not warranted on this ground.

C. Comments By The Trial Judge

When reviewing a trial judge's comments for error, this court has noted that

[t]he trial court has wide discretion in stating facts and commenting on the evidence. It is within the trial court's power to direct the trial in a manner reasonably thought to bring about a just result[,] and in pursuit of that goal nonprejudicial comments may be made from time to time. Conduct of trial proceedings will not be disturbed on appeal unless it affirmatively appears from the record that the trial court abused its discretion.

*Hynes v. Energy West, Inc.,* 211 F.3d 1193, 1201 (10th Cir.2000). Where no objection was made at trial, we only review the comments for plain error. *See id.* at 1202.

The appellant points to a pair of comments by the judge suggesting that the judge was biased and that the jury heard improper comments. The first comment, which the jury heard, came when the appellant's counsel was examining Mr. Ray regarding whether the pipe could be considered contraband under DOC regulations and Oklahoma law. The judge said:

We have learned pretty clearly that you can't have contraband in there, but we don't know what contraband is. The pipe may be contraband, or the pipe may not be contraband. That pen I'm holding in my hand may be contraband if it's going to be used to stab out somebody's eye. Otherwise, if it's properly used, it's not contraband. So go ahead and pursue this if it's going to bring

something that's helpful to this jury, but otherwise, let's don't spend any time with it.

Aplt's App. vol. I, at 285.

Later, outside the hearing of the jury, the judge remarked:

I think [the defendants'] position is, when it's properly used, [a pipe is] not contraband or not a weapon, but when it's improperly used, it may well be a weapon or contraband. That seems to be the gist of the whole matter, I think, isn't it?

Aplt's App. vol. II, at 313.

The appellant protests the judge's characterization of whether the pipe was contraband, for she believes it was clear that the pipe was contraband and that, therefore, the judge was arguing the defendants' theory before the jury. In her reply brief, the appellant suggests the judge's comments impermissibly compared the dangerousness of the pipe to a pen, prejudicing the jury. No objection was made to either comment during the trial, however.

Under the plain error standard of review, the trial judge's comments do not warrant relief on appeal. The judge's comments seem to be instructive rather than normative—they were guiding the plaintiff to focus the questions or to move on. The comments were presumably not intended to tell the jury that the pipe was not contraband or that the defendants' arguments on this point were meritorious, especially considering the fact that the jury did not hear one of the comments. The trial judge's statements do not constitute plain error, so therefore we cannot reverse on this ground.

III. Conclusion

There is a strict standard of review when a party appeals the denial of judg-

ment as a matter of law, and the appellant has not shown that her motion should have been granted at trial. Further, the appellant's appeals of the trial judge's evidentiary rulings and her arguments about the judge's statements at trial do not warrant relief. Therefore, we AFFIRM.